UNITED STATES of America,
Plaintiff-Appellee,

v.

Alberto GARCIA–RODRIGUEZ (t/n Ruben Gutierrez-Garcia), Alfonso Garcia-Sanchez, Francisco Martinez-Martinez, Defendants-Appellants.

Nos. 76–3635, 76–3697 and 77–1050.

United States Court of Appeals,
Ninth Circuit.

Aug. 10, 1977.

Rehearings and Rehearings En Banc
Nov. 14, 1977.

Charles R. Khoury, II, Del Mar, Cal., Timothy K. MacNeil, Uribe, Sorem & Mac-Neil, Stuart Smits, San Diego, Cal., argued, for defendants-appellants.

Terry J. Knoepp, U. S. Atty., John J. Robinson, Asst. U. S. Atty., argued, San Diego, Cal., argued, for plaintiff-appellee.

Before BARNES, WALLACE and SNEED, Circuit Judges.

BARNES, Circuit Judge:

This is a consolidated appeal from the Southern District of California, before Judge Turrentine.[1] Each of the three appellants was convicted on two counts, one of conspiracy to possess marijuana, and one of the possession of marijuana.

## I. Alleged Errors.

(1) Was there error in the Court's refusal to grant Rule 29(a) Motions for Judgment

1. In each instance we refer to the three appellees by their *paternal* Mexican names, i. e., Ruben *Gutierrez*-Garcia, Alfonso *Garcia*-Sanchez, and Francisco *Martinez*-Martinez.

Gutierrez was sentenced to three years with six months in confinement and probation for the rest of the three years, each count to run *concurrently.*

Martinez was sentenced to two years with three years probation, each count to run *concurrently.*

Garcia was sentenced to the custody of the Federal Youth Corrections Act, each count to run *concurrently.*

Appellants' primary contentions on appeal is that the evidence was insufficient to support the denial of the various Rule 29 motions for acquittal. Each appellant received a concurrent sentence on each of the two counts. Thus, if we affirm the conspiracy count, we need not consider the issues raised as to the possession count. *United States v. Costey*, 9 Cir., 554 F.2d 909, *cert. denied*, —— U.S. ——, 97 S.Ct. 2928, 53 L.Ed.2d 1065 (1977); *United States v. Westover*, 511 F.2d 1154, 1155 (9th Cir. 1975); *United States v. Murray*, 492 F.2d 178, 186 (9th Cir. 1972), *cert. denied*, 419 U.S. 854, 95 S.Ct. 98, 42 L.Ed.2d 87 (1974).

of Acquittal, based on the insufficiency of the evidence produced prior to the first motion to suppress;

(2) Was there error in stopping a PHd van, which had left a certain warehouse theretofor under surveillance by customs officers, and in denying the Motion to Suppress the marijuana which was contained in it;

(3) Was there error in denying a Motion to Suppress the marijuana found in a warehouse because of warrantless entry early on August 5, 1976 by two undercover customs agents;

(4) Appellant Gutierrez raises as error the refusal of the court to give an instruction requested by him.

We affirm as to each appellant on each count.

## II. *Evidence.*

On July 28, 1976, a large semi-tractor truck entered the United States at Tecate, Mexico with a declared 30,000 pounds (or fifteen tons) load of scrap tin, to be delivered to a Los Angeles firm. There were no facilities to thoroughly search the vehicle and its load at Tecate, and the truck was allowed to proceed into the United States. On a private off-duty mission of his own, the Tecate Customs Inspector who had passed the truck through customs, saw it that same day about 10:15 a. m. headed for Chula Vista; not for Los Angeles. He later notified the Tecate Station of his observation.

On August 5, 1976, at 8:30 a. m., the same truck (easily identified) and the same driver, with a similar load of tin consigned to Los Angeles, came through Tecate again with 31,600 pounds of declared scrap tin. It was allowed to pass, but was placed under continuous surveillance as it drove away from Los Angeles and toward Chula Vista, until it entered a warehouse about 10:00 a. m., at Chula Vista. The warehouse's two front doors had previously been opened and remained open during part of that day. A wire fence surrounded a yard at one side of the warehouse (on which the open doors were located), and its wire gate was open during the entire day after 10:00 a. m.

About 10:15 a. m., two undercover Customs Inspectors, Mr. Pitt and Mr. Wise, drove their vehicle to the wire fenced, enclosed area, through its open gate, and parked their car near the double open doors, and entered into the warehouse on foot, about 50 or 60 feet. They saw the truck and trailer in the open, unpartitioned, otherwise unused 26,000 square-foot warehouse, and a U-Haul van parked near (Government's Ex. No. 7). The two inspectors talked to two of the several defendants about a possible rental of the warehouse. They saw that some tin scrap had been unloaded from the truck, and thereafter left the warehouse premises. The surveillance of the warehouse was continued from a distance.

Thereafter, during the day, at least nine automobiles entered the yard, and four or five entered the warehouse. Of these three of them were rental vans (the blue Ford Econoline, Govs.Exs. 10 and 11; the PHd rental van, Gov.Ex. 6, which was later stopped; and the U-Haul van). Two others were pickup trucks, and three or four more were passenger cars. Counting the individuals who arrived on foot from cars parked outside the fenced area, approximately ten "apparently male Mexican workmen", also entered the warehouse.

A Drug Enforcement Administration (herein DEA) agent was called by the surveilling customs officers, and directed the proceedings thereafter. The officers decided to keep the warehouse under surveillance until one or more of the vehicles inside the warehouse, which were of a type that could conceal the contents of the vehicle, should leave the warehouse. At 5:17 such a vehicle (the PHd van) left the premises, was stopped for investigation 500 yards away, and when the driver opened the rear door, the customs officer could see and smell the marijuana contained therein, 498 kilos of it. The driver was then arrested. Almost immediately the officers entered the warehouse and arrested eight within it, and one outside it.

They saw the two other vans were loaded with kilos of marijuana, and two piles of kilos of marijuana stacked in corners, on the floor: a total of about 1,301 kilos. About one-half of the scrap tin was off the truck on the floor (Gov.Ex. 5), and the semi-truck was about one-third full of scrap tin (Gov.Ex. 3).

The foregoing evidence was introduced on the hearing of the motion to suppress evidence heard on September 20th and September 29th, 1976, before the Honorable Howard B. Turrentine; who, after hearing argument from all defendants, denied the motions to suppress, in a carefully thought out statement appearing at pp. 205 to 210 (C.T.).

Judge Turrentine discussed the geographical factors present, the location of Tecate 30 miles east of Tijuana; its smallness as a commercial area and that port of entry station's lack of facilities for the inspection and search of commercial vehicles (as compared to the facilities at Tijuana). He commented on the unusual route to be taken by the two truck loads, ostensibly headed for Los Angeles. The judge mentioned the continuous surveillance of the second load from the border until it drove into the warehouse; mentioned and characterized the several "For Lease" signs on and about the premises. "And I note that none of these signs indicated, Do not Disturb Tenant; Call Real Estate Office, or Call for Appointment to View—merely said the building was for lease." He commented on the officers' morning entry through the open wire gate; and the open warehouse doors, and their seeing that the tin was being off-loaded at Chula Vista, not Los Angeles.

At pp. 208–210 (C.T.), the Court then stated:

"Now, it's clear to me that the manner and method by which the building was occupied and used, that the occupiers and user had no reasonable expectation of privacy. One, if they'd have wanted privacy they could have closed the gates and the door.

"Secondly, they knew, at the time, that the building was for lease and they could have, at any time, expected people to call, or to come into the premises. And it's not entirely uncommon for people to walk into parking lots and into buildings just to look to see what's going on.

"With this, it was pretty obvious that they were taking the scrap metal off, that something was wrong, the manifest showing Los Angeles, and the scrap tin is being unloaded in this warehouse in Chula Vista. People start coming and going, and the officers have a pretty good idea, by that time, what's in there, or should have, and they wait till they see a van, a U-Haul van goes in and comes out, and we know that most of the marijuana is hauled in rental cars, that's the way it is. People don't like to subject their own personal vehicles to seizure, so they go out to Kirby's and lease a car and use it.

"No question in my mind that the officers had a right to enter the building for purposes for which they did. There's no question in my mind that they had a right to stop the van, as they did, at least, a founded suspicion to stop the driver of that car. And the Court made special inquiry this morning, as to the amount of marijuana in the truck, for a particular purpose, 400 and some odd kilos, and I've always been leery of the officer that smelled the strong odor of marijuana, two or three kilos, but when there's 488 kilos, and a warm day in August, the probabilities are that smelled like a bale of alfalfa, hay in the field.

"So, the motion to suppress the evidence is denied."

III. *Participation in the Conspiracy.*

With the exception of defendant Jaime *Murillo*-Pacheco (who was driving the PHd van, with its 498 kilos of marijuana when arrested), all defendants arrested and charged were on the warehouse premises, and had been there inside the warehouse during the last four or five hours before 5:20 p. m. Some .1,800 kilo packages of marijuana, easily recognized as such, had been first unloaded and next loaded again

in another vehicle, or placed in open piles, all in plain sight and obvious smell of any person within the one-room, non-partitioned space of the warehouse. It is a reasonable inference to conclude that all present were knowing participants in the possession of, and in a conspiracy to possess, marijuana, with the intent to distribute it within the United States.

We are of the view that the combination of facts cited above, together with the inferences that could properly be drawn, supported the district court's decision, and that a conspiracy in fact existed. *Cf. United States v. Guerrera*, 554 F.2d 987, 989 (9th Cir. 1977). We must keep in mind that the present three appellants do not contest the proof establishing a conspiracy to smuggle marijuana, but only dispute the fact that evidence existed connecting each of them with the conspiracy. "[Their] argument fails to account for the lower standard of proof for the latter once the conspiracy has been proved beyond a reasonable doubt." *United States v. Wood*, 550 F.2d 435, 441 (9th Cir. 1976). Once a conspiracy is established to the satisfaction of the trier of fact, little evidence is required to connect one who is in contact with it (and particularly one who is an active, physical participant), even though he is but slightly involved in bringing the conspiracy to its attempted conclusion. *United States v. Costey*, 554 F.2d 909, 910–911 (9th Cir. 1977), *cert. denied*, —— U.S. ——, 97 S.Ct. 2928, 53 L.Ed.2d 1065 (1977)—("We find that this constitutes the necessary slight evidence of participation. The evidence in the aggregate indicates that Costey intended to join and cooperate in the illegal venture. *Miller v. United States*, 382 F.2d 583, 587 (9th Cir. 1967)"); *United States v.*

*Freie*, 545 F.2d 1217, 1221–22 (9th Cir. 1976).

In determining this issue, we must view any reasonable inference arising from the evidence in a light most favorable to the government, as the prevailing party. *United States v. Hood*, 493 F.2d 677 (9th Cir.), *cert. denied*, 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974).

"The government does not have to prove that all of the defendants met together at the same time and ratified the illegal scheme. This just is not the nature of a conspiracy, especially a large narcotics smuggling and distribution organization as we have here. . . . See *Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947)."

*United States v. Perry*, 550 F.2d 524, 533 (9th Cir. 1977).

### IV. *The Warehouse Entry.*

The denial of the motion to suppress the marijuana in the warehouse was proper. There was no expectation of privacy in the warehouse by the lessees at the time of the warrantless entry at 10:15 a. m. on August 5, 1977 by government agents. The lessees knew there were two other sets of keys in the hands of non-lessees; the one wire gate and several doors were standing open and unguarded; the lessee was instructed to welcome men and vehicles. No signs prohibited, or even indicated any attempt to restrict, the entrance by the public onto the premises. Indeed, the only one observed by the agents was a large "For Lease" sign.

Further, the government agents seized nothing, and saw no contraband upon their entry.[2]

**2.** The appellants also moved to suppress the marijuana hidden in the truck within the warehouse when the two customs officers (Pitt and Wise) entered the warehouse in the forenoon of August 5, 1975, about 10:15 a. m.

The only persons within the warehouse at 10:15 a. m. were defendants Martinez, Razo, and the non-defendant truck driver Vasquez. Defendants Olmos, Murillo and Garcia arrived just as Pitt and Wise left the warehouse (R.T. 104). Pitt and Wise saw no contraband while within the warehouse, nor any furtive or suspicious actions, and had no reason to reasonably believe there was any contraband therein when they left. And, of course, they neither *searched* nor *seized* any contraband.

Thus appellant defendants had no standing, automatic or actual, to move to suppress contraband based on the 10:15 a. m. entry. *Cf. United States v. Guerrera*, 554 F.2d 987, 989–90 (9th Cir. 1977).

## V. *Further Facts.*

The second motion to acquit was heard by Judge Turrentine after the government had completed its case to the jury trial. Much of the evidence introduced on the motion to suppress was introduced again at the trial, as well as much new evidence. Included were (1) the two manifests as to the two loads declared, their size and their purported destination; (2) photographs of all defendants; (3) the lease of the warehouse; (4) the rental agreements for two of the vans[3] (these two vans when seized contained 560 and 498 kilos of marijuana, respectively); (5) the government "arrest, search and seizure forms" of the two vans listed in Note 3, as well as "the Chevrolet blue van" (this van was seized in the warehouse and was found to contain 661 kilos of marijuana); (6) the details of the continuous surveillance; (7) the stop of the PHd van and, after the discovery of 498 kilos of marijuana inside, the arrest of Jaime Murillo-Pacheco (Gov.Ex. 20); and (8) it was stipulated that all confiscated kilos contained marijuana.

Finally, the government called a co-defendant (Castaneda) to testify. He stated that he was arrested at the warehouse on August 5, 1976, and that he was unloading a truck of tin scrap and marijuana that day. Castaneda testified that there were others involved in unloading the truck.[4]

---

**3.** The '67 Ford Econoline van, registered to U-Haul, rented to Francisco *Martinez* and signed out by him on July 28, 1976, to be returned on July 29, 1976, but not returned until August 17, 1976. The Ford Econoline 300 van, registered to rental, was signed out on August 4, 1976 "a. m." and was due in on August 4, 1976 "p. m.", but it was not returned until August 17, 1976, at noon.

**4.** "Q Did you take all the scrap tin off the truck?

A Not I alone. There were four of us.

Q And was there anything inside the tin on the truck?

A No, not the first half of the truck. From one-half or half of it back.

Q And from that halfway back, what else was on the truck?

A There was some packages, more or less the size of that box, that contained a lot of packages.

Q And the outer package, was that plastic?

A Yes.

Q What did you do when you reached these packages?

A Well, we were very surprised, and we kept looking at each other, and then Mr. Olmos arrived, and he said, 'Hurry up, Hurry up.'

Q What happened then?

A Then we started to take them off, or unload them. There were sort of in between that kind of material, and in some large packages, more or less, packages like the size of the box.

Q You say Mr. Olmos arrived. What do you mean? Arrived in the warehouse?

A No, because he had arrived just about twenty minutes beforehand, *and he had taken us to eat, all the ones that were there, and then he said when we finished eating, 'Hurry up, hurry up.'* Then, as soon as *we* finished eating, *we* returned to the truck, and *we* began to work, and that was when *we* discovered that. He was in the back part of the truck. And when he saw one, *we* were surprised, and he said, "Hurry up, hurry up'. See if you can reach me. Then *we* took one off. We gave it to him. He put it in the bottom of the truck, and he said, 'Hurry up, hurry up. There's more.'

Q Did anyone open one of those bags, one of those plastic packages?

A Mr. Olmos.

Q And did you see what he took out of the plastic bag?

A Some weeds. He opened—we unloaded one package. He opened one, he would look at it, close it, and would replace it back where it was, and he said, 'Put these over here. Put those over there. Put these over here.'

Q I'm holding four exhibits marked government's exhibits 26, 27, 28 and 29. Have you seen packages like this before?

A Yes.

Q And where did you see them?

A In the packages that were there, but they weren't packages like that. They were in larger packages.

Q Were these the packages that were inside the large packages?

A Yes.

Q And did you know when Mr. Olmos opened the bag what it was that was in those packages?

A Well, I saw from a distance. Not too close, but I had an idea.

Q What was it?

A I believe it was marijuana.

Q And then, after you saw what you believed to be marijuana, were there still packages on the truck?

A Could you please repeat it?

Q Were there still more packages on the truck after you saw Mr. Olmos with the marijuana?

The appellants then made a Rule 29 motion for a judgment of acquittal. After hearing argument, Judge Turrentine adequately and carefully explained why he would deny it:

"The Court: Well, gentlemen, we have a large warehouse here, twenty-six thousand square feet. We also have just short of two thousand kilos of marijuana. We have five or six people in the warehouse. Those defendants are on trial here today were in the warehouse. We have a truck with thirty tons or thirty thousand pounds of metal, half of it unloaded. We have a U-haul which was loaded with five hundred kilos of marijuana. We have a blue van that had six hundred sixty-one kilos of marijuana. We have a hundred eighty kilos on the ground up in the northwest corner of the warehouse waiting to be picked up, I would guess. We have four hundred eighty-nine kilograms of marijuana that was picked up in the PHd.

"Certainly, the Government wasn't inside there to see who loaded the truck, unloaded the truck and trailer, who moved the marijuana and who loaded it, but *I think a reasonable inference can be drawn that with nineteen hundred kilos of marijuana, that there people moved it from the truck to the various smaller conveyances, smaller truck, and that it was—they were a part of this conspiracy to possess with intent to distribute the marijuana involved in the case.*

"The other charge, possession with intent to distribute, we'll just let the jury decide as to both of them. It may be arguable the government hasn't met the burden, but I think there is sufficient evidence to go to the jury, and the jury may draw from there inferences as may exist.

A   Yes, Yes. You couldn't see a lot of them, but a few—the more we went in, we would see more and more.
Q   And then what happened to the rest of the packages that were on the truck?
A   Well, we took them off, or unloaded them, and we put them on the bottom. There

"Motion of acquittal on behalf of all the defendants is denied." [Emphasis added.]

(R.T. p. 262, 1. 24 to p. 264, 1. 3.)

We hold this ruling was not erroneous for the reasons hereinbefore stated as applicable to the first motion.

## VI.   Testimony of Co-defendant Razo.

■ Thereupon, counsel for Mr. Razo announced he was ready to open the defense for his client. The three counsel for the defendants now appealing (Gutierrez, Garcia and Martinez) rested their defense without the production of any evidence. For the record, the judge ordered a Rule 29 motion entered and denied.

Razo then testified. He admitted renting the warehouse, as had been previously testified to, but denied he had been present when the blue Chevy van was purchased, as testified by a previous witness. He stated that on August 4, 1976, he had received a phone call which he thought to be from co-defendant Olmos (compare R.T. 271–72 with R.T. 241) requesting him to open the warehouse early on August 5, 1976, which he did.

Razo was paid by Olmos and was urged to help unload the scrap tin. When Razo first testified that he suggested using a forklift to unload the scrap, Olmos replied: "What are you talking about? The marijuana is inside and with the forklift it could hurt those packages." Olmos opportuned Razo to help unload, and Razo did so. Under cross-examination, Razo testified he asked Olmos:

"Q   Why don't you get one of those forklift so you can take that scrap metal off of it easier, you know?

And he says, "Are you crazy? This is marijuana inside, and its covering the packages." (R.T. 311 and 313.)

was two persons that would help us put them on the bottom, because Mr. Olmos would say, 'Put this here. Put this over there. Hurry up.' And we were very tired, and he was the one that was making us hurry."

(R.T. p. 236, 1. 2 to p. 239, 1. 11).

Razo testified that this request made him "unhappy." "I wasn't feeling good—I feel like running away this minute, but I said they probably follow me or something. They know already they got marijuana, so I better keep my mouth shut and keep working." And he did (R.T. 275 and 313–14). It was Razo who talked to Officers Pitt and Wise within the warehouse earlier on the morning of August 5, 1976. Razo had been told by Olmos previously there would be some cars and a semi-truck showing up at the warehouse, and to let them in the warehouse (R.T. 296). Razo identified appellant *Martinez* as the driver of the U-Haul van (Gov.Ex. 15) (R.T. 298), who sat in his van watching "the others," and reading (R.T. 303). Olmos and "two others" arrived as Officers Pitt and Wise left. They were Murillo (Gov.Ex. 20) and Garcia (Gov.Ex. 16) (R.T. 304).

At first and before lunch, Razo and "the old man, the driver" (non-defendant Rafael Vasquez) were unloading scrap tin. Then Olmos got lunch, and Razo and "all the rest of the guys ate lunch" (R.T. 320), and *after* lunch, *Garcia* and *Murillo* helped unload "up on the truck with me." Co-defendant Castaneda (Gov.Ex. 22) also helped unload, and co-defendant Espericueta (Gov.Ex. 21) was "receiving the packages of marijuana" and putting them on the vans, as was co-defendant Olmos (R.T. 314).

The kilo packages were wrapped in transparent paper all around. (See Gov.Ex. 13) When the big packages were dumped off the truck onto the floor, Olmos opened some (but not all), to count the smaller kilo packages.

Razo identified co-defendant Osornio as present and working during the unloading (Gov.Ex. 18, R.T. 328). He identified Ruben *Gutierrez*-Garcia, as present and "helping everybody unload, pushing those bundles" (Gov.Ex. 17, R.T. 328).

Thus, there was specific testimony which, if believed, tied each appellant into the conspiracy, and established the substantive count of possession.[5]

### VII.  *The Stop of the PHd Van.*

The sole question on this phase of the appeal is whether the district court erred in denying the appellants' motion to suppress the contraband. We first question the standing of either of the three appellants to raise the question. None of them claim any ownership or possessory interest to the 640 kilos of marijuana in the PHd van.[6] We could, but need not, rely on the lack of standing in each of these three appellants.

■ Entirely apart from the lack of standing, we conclude that both the stop of Murillo's van, and his subsequent arrest without a warrant, were each reasonable

---

**5.** Thus, when the case went to the jury, there was evidence (a) that appellant *Martinez* had been in the warehouse in his van from at least 10:00 a. m. to 5:20 p. m., "watching the others working" and while his van was being loaded with 500 kilos of marijuana (R.T. 303) and that he had rented the van, and signed this rental agreement on July 28, 1976 the day the first truck came across the border (Gov.Ex. 32); and (b) that appellant *Garcia*, had, after lunch, helped to unload the scrap and marijuana from the truck (R.T. 320–324); and (c) that appellant *Gutierrez* was present, and for an indefinite period, during August 5th, was "helping everybody unload, pushing those bundles" (R.T. 328).

Even conceding the evidence against one or more of these defendants was "slight", mere "slight" evidence is sufficient "to justify an inference of complicity . . . when viewed in the context of surrounding circumstances." *United States v. Turner*, 528 F.2d 143, 162 (9th Cir.), *cert. denied*, sub nom. *Grimes v. United*

*States*, 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975); *United States v. Calaway*, 524 F.2d 609, 614 (9th Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 733 (1976).

These three appealing defendants, in addition to Olmos, Murillo, Castaneda, Espericueta, Razo and Osornio, were the nine original defendants arrested and charged with conspiracy, and the overt act of *traveling* to the warehouse.

**6.** "Petitioners . . . alleged no proprietary or possessory interest . . . [in the PHd van, or the marijuana seized from within the van] nor was any evidence of such an interest presented to the District Court." *Brown v. United States*, 411 U.S. 223, 225–26, 93 S.Ct. 1565, 1567, 36 L.Ed.2d 208 (1973), and it is clear that they cannot assert the Fourth Amendment right of another. *Brown, supra*, 411 U.S. at 230, 93 S.Ct. 1565; *United States v. Guerrera*, 554 F.2d 987, 990 (9th Cir. 1977). Driver Murillo did not appeal.

and proper. Initially, concerning the stop of the van, it is noted that the events herein occurred near the border in an area with a high incidence of contraband smuggling. The suspicion of the Tecate Customs Inspector, who had five years of experience, was properly aroused when he observed the semi-tractor truck divert from its declared route to Los Angeles and take a smaller more winding road in a different direction towards Chula Vista. Likewise, that suspicion was strengthened when, a week later, the same driver in the same truck, after presenting papers to the same customs officer and making statements to the effect that the truck was travelling to Los Angeles, again took the same turnoff to Chula Vista. Maintaining a constant surveillance, the officers determined that the truck ultimately stopped at a warehouse, which, except for the truck, was entirely empty. Thereafter, there began a procession of automobiles, vans and small open trucks in and out of the warehouse facilities, with approximately a dozen individuals involved. At that point, the officers had a founded suspicion to believe that any one of the covered vans "leaving the warehouse would contain contraband." Thus, they were entitled to make "an investigatory stop." *United States v. Thompson*, 558 F.2d 522, 524 (9th Cir. decided June 27, 1977); *United States v. Larios-Montes*, 500 F.2d 941, 943–44 (9th Cir. 1974), *cert. denied*, 422 U.S. 1057, 95 S.Ct. 2681, 45 L.Ed.2d 709 (1975).

■ We then turn to whether, after such stop, there was probable cause for Officer Maxwell to arrest Murillo. On the motion to suppress, a trial judge held there was probable cause for the arrest. We agree.

At the Motion to Suppress, Officer Maxwell testified at the time he *approached* the van he noticed a strong odor of marijuana coming from the van (R.T.M.,[7] p. 150). On cross-examination, Maxwell was shown the report he made on August 6, 1976, with respect to his stopping the PHd van, and his arrest of the driver, co-defendant Murillo.

He admitted the report did *not* state he smelled the marijuana when he *approached* the van (R.T.M., p. 164). However, it did state that he did smell the marijuana *after* the rear door had been opened. (R.T.M., p. 164). On direct examination at the trial, Maxwell said he noticed the smell of marijuana "while talking to the driver," "a strong, pungent odor of marijuana." (R.T., 243). This represents a conflict in the evidence on an important point, but the trial judge chose to believe the officer's testimony at the trial. However, none of the defendants at the trial cross-examined Maxwell on his testimony.

In addition to his statements regarding the marijuana odor, Officer Maxwell also testified at the hearing on the motion to suppress, that the second officer at the investigatory stop (Officer Kelly) had apparently looked into the rear window of the van and observed what seemed to be marijuana bricks. (R.T.M., p. 151).

■ We have repeatedly held that, "[i]f after a valid investigatory stop probable cause arises, the search may then be made", *United States v. Bugarin-Casas*, 484 F.2d 853, 854 (9th Cir. 1973), *cert. denied*, 414 U.S. 1136, 94 S.Ct. 881, 38 L.Ed.2d 762 (1974). *See, e.g., United States v. Russell*, 546 F.2d 839, 840 (9th Cir. 1976); *United States v. Bates*, 533 F.2d 466, 468–69 (9th Cir. 1976); *United States v. Portillo-Reyes*, 529 F.2d 844, 850 (9th Cir. 1975), *cert. denied*, 429 U.S. 899, 97 S.Ct. 267, 50 L.Ed.2d 185 (1976); *United States v. Rocha-Lopez*, 527 F.2d 476, 478–79 (9th Cir. 1975), *cert. denied*, 425 U.S. 977, 96 S.Ct. 2181, 48 L.Ed.2d 802 (1976). The detection of marijuana odor emanating from a vehicle has been held sufficient in such situations to give rise to probable cause to search. *See Russell, supra*, 546 F.2d at 840; *United States v. Laird*, 511 F.2d 1039, 1040 (9th Cir. 1975); *United States v. Ojeda-Rodriguez*, 502 F.2d 560, 561 (9th Cir. 1974), *cert. denied*, 420 U.S. 910, 95 S.Ct. 830, 42 L.Ed.2d 839 (1975). Likewise, the observation of

---

7. "R.T.M." refers to the Reporter's Transcript for the hearing on the motion to suppress before Judge Turrentine. "R.T." refers to the Reporter's Transcript for the trial before Judge Turrentine.

what apparently is contraband material in plain view within a vehicle would also give rise to probable cause for a search. Here, there was testimony which, if believed, established both the sighting and smell of the marijuana during a valid investigatory stop.

In addition, it is also noted here that the investigatory stop took place *after* ordinary office hours of judicial officers to whom the government agents might have gone for a warrant. Prior to the exit from the warehouse of some vehicle which was suitable to carry contraband, the officers could merely surmise what was going on within the warehouse. The time of the day when the stop occurred was triggered by the defendant's conduct alone; not by that of the officers. The exigencies of all the existing circumstances authorized and required an investigatory stop. *United States v. Brignoni-Ponce*, 422 U.S. 873–874, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

■ We hold it was lawful.

"The search made here was proper under the moving vehicle exception. Under this exception all that is required to stop and search an automobile on the highway is probable cause to believe that it contains any kind of contraband. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The search is justified by exigent circumstances because 'the car is movable, the occupants are alerted, and the cars content may not be found again if a warrant must be obtained . . . .' *Chambers v. Maroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970)." *United States v. Abascal* (9th Cir., decided March 18, 1977).

### VIII. *Instructions.*

With respect to Gutierrez' claim of error in instructions, he points to the trial judge's refusal to give the sole instruction offered by Gutierrez on the necessity of proof of specific intent to commit the offense, which was alleged to have been the object of a particular conspiracy. Instead, the trial court gave its own conspiracy instruction.

Counsel for Gutierrez goes so far as to state that specific intent was *never* mentioned in the court's instruction (Gutierrez' Opening Brief, p. 8, lines 13–14). However, in addition to the court's own instruction objected to by Gutierrez (appearing at R.T. 342 to 344), the court had previously instructed on specific intent (R.T. 339, line 18, to 340, line 18). There, proof of specific intent was mentioned at least three times. There it was stated that the inference of intent may arise from surrounding circumstances, and that such intent may be proved by circumstantial evidence.

In this portion of his instructions, the trial court also instructed the jury as follows:

"Mere presence at the scene of the crime and knowledge that the crime is being committed are not sufficient to establish that the defendant committed the crime or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator." (R.T. 340).

The instruction given, with slight changes, follows *Devitt & Blackmore's* Instruction 13.03, 2d ed., p. 273.

■ Reading the instructions given by the trial judge "as a whole," *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), (as the jury here was carefully instructed it must do—(R.T. 335)), and looking upon the evidence in the most favorable light to sustain the judgment of conviction, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Ramirez-Rodriquez*, 552 F.2d 883, 884 (9th Cir. 1977), we have no hesitation in concluding that the judge's total instuctions on specific intent was sufficient and adequate, and did not constitute error. A trial judge need not give an instruction proposed by counsel for either side, provided he gives adequate instructions on each element of the case.

"A party has no vested interest in any particular form of instructions . . . the language of the instructions is for the trial court to determine. If on the entire

charges it appears that the jury has been fairly and adequately instructed, the requirements of the law are satisfied." Moore's Manual of Fed. Practice and Procedure, Vol. 5a, § 22.07(2).

*See also Tucker v. United States*, 151 U.S. 164, 170, 14 S.Ct. 299, 38 L.Ed. 112 (1893); *United States v. Edwards*, 503 F.2d 838, 841 (9th Cir. 1974); *Amsler v. United States*, 381 F.2d 37, 52 (9th Cir. 1967); *Rivers v. United States*, 368 F.2d 362, 364 (9th Cir. 1966). There was no error in the instructions as given.

Finding no error in the conviction of each appellant, we *affirm* the convictions as to each.