**UNITED STATES Of America,**
**Plaintiff—Appellant,**

v.

**Jeffrey BIGSBY; et al., Defendants—**
**Appellees.**

No. 04–30347.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 14, 2005.

Decided Aug. 22, 2005.

Tessa M. Gorman, Esq., USSE–Office of the U.S. Attorney, Seattle, WA, for Plaintiff–Appellant.

Allen R. Bentley, Esq., Bukey & Bentley, Robert W. Goldsmith, Seattle, WA, for Defendants–Appellees.

Before: TASHIMA, PAEZ, and CALLAHAN, Circuit Judges.

MEMORANDUM *

The United States appeals a pre-trial ruling by the district court granting defendants Jeffrey Bigsby's and Sam Sadis's motion to suppress evidence obtained in violation of the Fourth Amendment. Bigs-

---

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

by and Sadis were arrested and charged with conspiracy to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 846, and with possession with intent to distribute marijuana in violation of 21 U.S.C. § 812. We have jurisdiction pursuant to 18 U.S.C. § 3731, and we affirm. We review determinations of reasonable suspicion de novo and findings of historical fact for clear error, giving due weight to "inferences drawn from those facts by resident judges and local law enforcement officers." *United States v. Ornelas*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).[1]

The government argues that the district court failed to consider the "totality of the circumstances" when concluding that Officer Pribble lacked reasonable suspicion to stop Bigsby's Toyota pick-up truck. *Id.* at 696, 116 S.Ct. 1657. The record shows, however, that the district court's factual findings encompassed all the relevant facts and background information, and that the court based its legal conclusion on the "totality of the circumstances." Although the district court agreed that there was sufficient suspicion to stop the Taurus that Officer Pribble had been following, the court concluded that the "zone of suspicion" surrounding the Taurus, standing alone, was insufficient to establish reasonable suspicion to stop Bigsby's Toyota. Reasonable suspicion requires a "particularized suspicion ... that the particular individual being stopped is engaged in wrongdoing." *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Here, there was no "particularized" conduct by the driver and passenger in the Toyota to signal their connection to the Taurus or involvement in criminal activity.

The government also contends that the district court's ruling is inconsistent with *United States v. Garcia–Rodriguez*, 558 F.2d 956, 964 (9th Cir.1977). We disagree. In *Garcia–Rodriguez*, we found reasonable suspicion to stop "any of the covered vans" leaving a private warehouse located "near the border in an area with a high incidence of contraband smuggling." *Id.* at 964. The warehouse was placed under surveillance by border patrol agents after a tractor had twice crossed the border, deviated from its declared route, and driven instead to the warehouse. While conducting the surveillance, agents could see a "procession of automobiles" coming and going. *Id.*

*Garcia–Rodriguez* does not apply to the facts at issue here. Agent Pribble stopped Bigsby and Sadis in a *public* parking lot in plain view from the road, which was not near the border or located in a high-crime area. Moreover, the officers did not see the Toyota arrive or even enter the "zone of suspicion" around the Taurus. Finally, Pribble's reasonable suspicion related to a specific car—the Taurus—and not a general location, such as a private warehouse. In light of the facts here, there was no reason for the officers to impute suspicion to any car other than the Taurus.

As the Court stated in *Illinois v. Wardlow*, "an individual's presence in an area of expected criminal activity, standing alone, is insufficient to support a reasonable suspicion that this person is committing a crime." 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Here, the fact that Pribble noticed Bigsby backing his car out of a public parking lot in which a suspicious car was stopped is simply not enough to support a "particularized suspi-

1. Because the parties are familiar with the facts, we reference them here only as they are necessary to explain our decision.

cion" of the Toyota or its occupants. To conclude otherwise would be to "draw into the law enforcement net a generality of persons unmarked by any really articulable basis for reasonable suspicion"—a practice this court has repeatedly warned against. *United States v. Sigmond–Ballesteros,* 285 F.3d 1117, 1121 (9th Cir.2002).

The district court correctly concluded that under the "totality of the circumstances," the facts of this case are insufficient to support Pribble's stop of Bigsby's Toyota.

The judgment of the district court is therefore AFFIRMED.

CALLAHAN, Circuit Judge, dissenting.

I respectfully dissent.

In this case, as in *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), we deal "with an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat." *Id.* Special Agent Mitchell Pribble had been a law enforcement officer for over eighteen years, and was employed by the Bureau of Immigration and Customs Enforcement ("ICE") and its predecessor, the U.S. Customs Service, for over fifteen years. Since joining the Customs Service, he spent the majority of his time conducting surveillances and assisting in the interdiction of smuggled goods.

For at least six weeks prior to the evening in question, federal agents had partnered with the Canadian Mounted Police to investigate a marijuana trafficking racket. During the investigation, agents learned that a van that was observed

transporting large quantities of marijuana in Los Angeles had been rented by Dean Brandt in Bellingham, Washington. Agents also learned that Brandt had rented vehicles in Bellingham on numerous occasions since July 2003, and that he had driven these vehicles in excess of 37,000 miles during this period.

On December 1, 2003, Agent Pribble observed that the van that was seen transporting marijuana in Los Angeles was parked at the Bellingham Airport. The van was still rented to Brandt. The rear seats had been removed, and the parking stub on the dashboard indicated that the van had been parked there since November 21, 2003.[1]

On December 5, 2003, Brandt crossed the border from Canada into the U.S. in a pick-up truck and drove to the Bellingham Airport. There, he removed van seats that were stored in another parked truck and placed them back into the van, which was still parked at the airport.[2] Brandt then returned the van to Avis. The van had been driven in excess of 22,000 miles and Brandt owed Avis $1,548, which he paid in cash. At the same time, he reserved another full-sized van. With Avis's permission, agents searched the first van and installed a tracking device in the second van. The search yielded packaging for a cellular phone and bed sheets.

At approximately noon on December 16, 2003, Brandt again entered the U.S. from Canada, this time driving a Jeep. Again, he drove to the airport and parked next to the second van. Again, he removed the rear seats of the van and placed them in the Jeep. Brandt then drove the van to a mall, where agents observed him purchasing a

---

1. Pribble testified that he found it "highly unusual that someone would put a van in a parking lot and pay every day, both rental charges and parking charges, when it could have been turned in a hundred yards away."

2. The parking ticket on the dash of the truck indicated that it had been parked in the airport lot since April 21, 2003.

cell phone and bed sheets—the same items that were found in the first van. At approximately 4:15 p.m., he drove to Fred Myer, a department store, where he parked and entered the store. At that time, there were no boxes in the van.

Roughly 45 minutes later, another man, later identified as Richard Sturdevant, got into the van and proceeded to drive around town in a circuitous manner that agents considered to be consistent with counter-surveillance. To avoid detection, agents relied on the tracking device to monitor the van's whereabouts. Sturdevant eventually drove to a remote location and stopped for approximately 35 minutes. Agents could not determine the precise location of the stop because Sturdevant had traveled beyond the range of the tracking device.

At roughly 6:00 p.m., Agent Pribble was able to reestablish visual surveillance of the van, which was now full of large cardboard boxes. Sturdevant drove the van back to Fred Meyer, parked, walked to a nearby gas station and got into the passenger side of a Ford Taurus.

Based on his experience, observations of the events of the day, and knowledge of the high volume of marijuana smuggled through Canada, Agent Pribble believed that Brandt had "dead dropped" the second van, and that Sturdevant had loaded it with drugs.[3] Meanwhile, federal agents observed that the Taurus was also filled with cardboard boxes, which they suspected contained drugs as well. Accordingly, they maintained surveillance of the Taurus.

The Taurus drove to a rural town and once there, like the second van, drove in a circuitous manner consistent with counter-surveillance. One of the agents on duty explained that the Taurus appeared to be engaging in a "heat check," meaning the driver took an indirect route from one place to another to determine whether he or she was being followed. Eventually, the Taurus parked in front of a restaurant in a remote area near the Harvey Field airport. Sturdevant and the driver sat in the Taurus in the parking lot for a short time, then drove across the street and parked for a short period in front of a business that was closed. Thereafter, the Taurus left the lot, circled the airport on Airport Way, and eventually pulled into the lot of another closed business and parked. It then made a u-turn and returned to the restaurant, where it parked again for a few minutes, moved on to yet another closed business and parked for a few minutes, and then circled back around the airport as it had done earlier.

At approximately 7:00 p.m., the Taurus pulled into the Big Trees parking lot—yet another business that was closed for the day.[4] By this time, it was very dark. A federal agent drove by the parking lot and confirmed that the Taurus had stopped. Agent Pribble then drove by the lot and saw between two and four people gathered at the back of the Taurus. He did not slow down because he did not want to arouse suspicion. He also observed a few other cars in the lot.[5] Based on these

3. Agent Pribble explained that a "dead drop" occurs when someone leaves a vehicle with keys in a public parking lot. Another person then drives the vehicle away, loads it with drugs, and returns it to the lot.

4. Agent Pribble believed the business was closed because the lights were off in the building and no one was around.

5. Mr. Pheifer, the operations manager of Big Tress Nursery, testified that there were four vehicles in the lot at that time that belonged to Big Trees employees.

observations, Agent Pribble testified he believed a drug exchange was underway:

> I expected that after seeing the van or the van loaded with boxes and boxes in the Taurus, I expected that they would go to a house or meet someone and deliver those boxes ... At that point, they're meeting people. I thought there would probably be an exchange of boxes. I did not have enough agents in that rural area to conduct surveillance on two vehicles. So, I elected to go ahead and make—to go in and detain the vehicles and determined [sic] what happened.

Citing officer safety concerns, Agent Pribble called for backup before entering the lot. By the time that his backup arrived and Pribble was able to approach the lot, he observed that there were no longer any people outside their cars, and that a truck located to the right of the Taurus was backing up as if it intended to leave— it was defendant Bigsby's Toyota. Given his observation of the gathering behind the Taurus just minutes before, and the fact that there was no one else around, Agent Pribble testified he concluded that there had been a meeting between occupants of the Toyota and the Taurus, and that the occupants of the Toyota were about to leave. Based on all of the foregoing, Officer Pribble had reasonable suspicion that criminal activity may have been afoot, which is all that is required. *Terry,* 392 U.S. at 30, 88 S.Ct. 1868.

The majority concludes that the defendants' mere presence in the "zone of suspicion" near the Taurus was insufficient to establish reasonable suspicion because defendants Bigsby and Sadis were located in a public parking lot in plain view from the road, which was not near the border or located in a high crime area. The suggestion is that in order to establish reasonable suspicion, law enforcement must have neatly defined facts and a predictable for-

mula. While it is true that reasonable suspicion requires particularized suspicion, *U.S. v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), this may arise out of the totality of the circumstances. The majority, however, effectively ignores the totality of the circumstances, which provides the real world context for determining reasonable suspicion. *See United States v. Montero–Camargo,* 208 F.3d 1122, 1129 (9th Cir.2000) ("Like probable cause determinations, the reasonable suspicion analysis is not readily, or even usefully, reduced to a neat set of legal rules and, also like probable cause, takes into account the totality of the circumstances.") (internal quotations and citation omitted). Moreover, we have expressly acknowledged that "sometimes conduct that may be entirely innocuous when viewed in isolation may properly be considered in arriving at a determination that reasonable suspicion exists." *Id.* at 1130.

Here, federal agents had gathered a plethora of information suggesting that the occupants of the Taurus were preparing to distribute a load of drugs. After engaging in counter-surveillance tactics for hours, the Taurus finally stopped. For the first time, several people gathered outside the vehicle. The meeting took place after business hours in a dark, remote, deserted parking lot—only four other cars were parked there, besides the Toyota and the Taurus. Indeed, these events occurred in rural Washington, where the evidence at trial established that traffic was minimal, even during business hours. The fact that the exchange took place in this "public" lot does not render "innocuous" the defendants' attempts to leave, minutes after an apparent drug exchange. Arguably, these were exigent circumstances because anyone leaving the premises at that particular moment might have absconded with significant drug evidence. It would have been

reasonable to detain the occupants of the Taurus and to follow Bigsby and Sadis; however, since Agent Pribble was short-handed, he made a *Terry* stop instead.

The majority turns common sense on its head and renders meaningless the totality-of-the-circumstances analysis that the law requires. By parsing the events of the evening, the majority concludes that the Toyota's presence in the parking lot had nothing to do with the Taurus or the suspicious conduct of its occupants. The majority effectively confers a neutral status to the Toyota by characterizing it merely as being within the "zone of suspicion." The law does not permit this. Determining reasonable suspicion requires consideration of the totality of the circumstances— the events of the entire evening—not each event in isolation, as the majority suggests.

Here, the totality of the circumstances established an unmistakable nexus between the Toyota and the Taurus by virtue of the Toyota's proximity to the Taurus and the meeting of people near both vehicles moments before the Toyota prepared to leave an otherwise, deserted parking lot. What the district court called a "good hunch" was not a hunch, a good hunch, or a coincidence. Officers not only had reasonable suspicion to stop the Toyota, but would have been remiss, in my view, in letting the Toyota go. It was not mere coincidence that immediately after making the *Terry* stop, Agent Pribble noted that the boxes were no longer in the Taurus and that the Toyota contained boxes, later determined to be full of marijuana. This simply was good police work.

For these reasons, I would reverse the district court's grant of the defendants' motions to suppress the evidence seized from the Toyota.