UNITED STATES of America

v.

Milton HAWKINS, Appellant.

No. 86–1083.

United States Court of Appeals,
Third Circuit.

Argued Sept. 18, 1986.

Decided Feb. 3, 1987.

---

Jeffrey L. Staniels (argued), First Asst. Federal Defender, Defender Ass'n of Philadelphia, Federal Court Div., Philadelphia, Pa., for appellant.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, Carlos A. Martir, Jr. (argued), Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Before SEITZ, SLOVITER and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

Appellant Milton Hawkins, who was convicted of possession of a firearm by a felon

under 18 U.S.C. app. § 1202(a)(1) and sentenced to a mandatory prison term of fifteen years because he had three prior convictions for burglary or robbery, challenges the legality of the stop which resulted in finding the gun and the legality of his sentence.

## I.

### Facts

At periodic intervals during the evening of March 20, 1985, Philadelphia police officers Robert Stott and Dennis Donlon were conducting plainclothes surveillance of a house in the Germantown section of Philadelphia for possible narcotics activity. The officers had been informed by two other police officers that the house was a suspected narcotics location. During their surveillance from 8:45 to 9:30 p.m. and from 10:00 to 10:30 p.m., one or both officers saw people go to the door of the house or go inside the house briefly and then leave. Although the officers did not see any drugs change hands between the occupants of the house and the visitors, Officer Donlon testified to having observed "exchange of hand motion." App. at 126.

At 11:30 p.m., the officers saw a car containing two persons pull up to the house. The passenger left the car, entered the house, returned to the car within five minutes, spoke with the driver for about a minute and then returned to the house. A few minutes later, the passenger exited the house with two men who got into the rear seat; the passenger got into the front seat.

As the car pulled away, the officers followed in an unmarked van. The officers testified that as the car travelled for several miles, it passed a bus, crossed double yellow lines, and ran a red light at a high rate of speed before parking. The officers parked in back of the car, turned on the van's high beams, got out of the van and approached the car. As they identified themselves, Officer Donlon, who had approached the car from the driver's side, observed Hawkins, who was sitting behind the driver, moving his arms and shoulders. Officer Donlon shined a flashlight on Hawkins who appeared to be trying to tuck something into the seat. The officers ordered everyone out of the car. As Hawkins exited the car, Officer Donlon observed him drop a gun to the seat and cover it with a pillow. Officer Donlon retrieved the gun and placed Hawkins under arrest. The officers frisked all four occupants of the car and found narcotics on Hawkins and the front seat passenger.

Following his arrest, Hawkins was charged with possession of a firearm by a felon under 18 U.S.C. app. § 1202(a)(1). Hawkins moved to suppress the gun. The district court conducted a suppression hearing at which the officers testified that they stopped the car in order to conduct an investigation of the alleged traffic violations. The district court held that since the officers identified themselves after flooding the car with their headlights, there was a "stop" under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The court also held that although there was no evidence to support a stop for the reasons given by the officers, the events the officers observed during their surveillance constituted "reasonable suspicion" to believe that the occupants of the car were engaged in a narcotics violation. On that basis, the court held that the stop was legal and that the resulting evidence was admissible.

## II.

### Legality of the Stop

Hawkins challenges both the district court's conclusion that the facts known to the officers were sufficient to create reasonable suspicion that the occupants of the car were engaged in a narcotics violation, and its conclusion that the stop can be justified on grounds different than those given by the officers. We consider first whether the court erred in finding the officers had objective reasonable grounds to justify the stop.

The district court credited the officers' testimony that they had been informed by two other officers that the

house at issue was a suspected narcotics location. In light of the reputation of the house and the observations by the officers of persons going to the house late at night for brief periods, some of whom were observed exchanging hand movement, and the actions of the occupants in the car,[1] we agree with the district court that there was sufficient basis to raise a reasonable suspicion that the occupants of the car, like the other visitors to the house, were engaged in the sale and purchase of narcotics. Given the time frame of the events, that suspicion justified a brief investigatory stop under the standards enunciated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Hawkins argues, however, that because the officers testified that their sole motivation for investigating the car once it came to a stop was the alleged traffic violations,[2] and the district court declined to credit this testimony,[3] the stop cannot be upheld. He argues that as a matter of law, the court may not rely upon its post hoc assignment of reasonable suspicion based upon the facts observed during the surveil-

lance.[4] We have found no direct Supreme Court authority on this issue, but the analysis applied by the Court in recent cases suggests that the legality of a stop must be judged by the objective facts known to the seizing officers rather than by the justifications articulated by them.

In *Terry v. Ohio, supra,* the Supreme Court held that the Fourth Amendment was not violated by a brief investigatory stop. The Court stated that the validity of such stops was to be "judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" 392 U.S. at 21–22, 88 S.Ct. at 1880. In cases following *Terry*, the Court reaffirmed that an investigatory stop will be sustained where "the detaining officers [had] a particularized *and objective basis* for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (emphasis added); *see also Brown v.*

---

1. The court described the actions of the car as follows:

   It is my understanding, and I would credit it as true from the testimony of the officers that they were on surveillance, that they did observe a car, the same car that was later stopped, drive up to the address, that the officers were surveilling that particular property as one reputed to be the property at which controlled substances were distributed; that when the car drove up to the address the person in the passenger's side of the front of the car got out, went into the house for a short period of time and minutes thereafter returned, apparently had a conversation with the driver and thereafter went back to the house. Then the passenger left the house together with two other individuals.

   App. at 308.

2. Officer Donlon, who was driving the van and thus made the initial decision to pull behind the car, testified:

   If you will excuse me, your Honor, when we said investigate—when the car pulled over and I went out to investigate, his investigation is what I would consider a car stop to check, not for the investigation of the drugs or the gun, but his investigation at that time was due to the illegal traffic violations that were occurring.

   App. at 150.

3. The district court noted that the officers did not stop the car immediately upon observing the violations, but rather followed the car another five to six blocks, that the officers did not approach the car until it had stopped on its own and parked, that the officers flooded the car with light and intentionally blinded the occupants, that the officers did not question the driver concerning his driving or give a test for erratic driving, and that once the uniformed officers who had the authority to issue tickets arrived on the scene, the driver was not given a ticket.

4. The district court did not expressly find that the officers did not observe the car committing traffic violations, but rather stated that "there is nothing about the evidence that would lead me to conclude that this was for the purpose of investigating a traffic violation, and I have no difficulty in making a finding that it was not for that." App. at 298. In light of our disposition, it is unnecessary for us to consider whether the officers' observations of a traffic violation would alone have justified the stop. *Cf. United States v. Smith*, 799 F.2d 704 (11th Cir.1986) (stop not justified by either objective facts or pretextual traffic violation).

*Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975).

The focus on objective factors rather than subjective intent has been illustrated by a number of decisions discounting the relevance of the officer's state of mind. In *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), the Court upheld the legality of a wiretap on the basis of the objective reasonableness of the search notwithstanding the officers' purposeful failure to comply with the minimization order. The Court stated that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action so long as the circumstances, viewed objectively, justify that action." *Id.* at 138, 98 S.Ct. at 1723. The Court approvingly referred to opinions of the Court of Appeals which "examin[ed] the challenged searches under a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved." *Id.*

Similarly, in *Maryland v. Macon,* 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985), the Court held that the purchase of obscene materials was not a seizure, despite the purchasing officer's intent to retrieve the marked purchase money for use as evidence. The Court stated: "Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' ... and not on the officer's actual state of mind at the time the challenged action was taken." *Id.* 105 S.Ct. at 2783 (quoting *Scott v. United States,* 436 U.S. at 136, 98 S.Ct. at 1722).

The *Scott/Macon* principle that a Fourth Amendment inquiry focuses on the objective facts known to the officer rather than the seizing officer's state of mind has been applied in a number of contexts. Both the Supreme Court and this court have held that a seizure that is valid based upon the stated purpose cannot be challenged on the grounds that the seizing officers were in fact motivated by an improper purpose. Thus, in *United States v. Villamonte-Marquez,* 462 U.S. 579, 584 n. 3, 103 S.Ct. 2573, 2577 n. 3, 77 L.Ed.2d 22 (1983), and in *United States v. Demanett,* 629 F.2d 862, 868–69 (3d Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981), valid stops of vessels for the purpose of inspecting required documentation were upheld despite evidence that the officers conducting the stops were in fact motivated by suspicions of narcotics violations. Similarly, in *United States v. Hensley,* 469 U.S. 221, 234–35, 105 S.Ct. 675, 683–84, 83 L.Ed.2d 604 (1985), a stop based upon an objective reasonable suspicion was upheld even though the officer making the stop intended to make an arrest of a suspect under circumstances where an arrest would not be justified. Finally, an arrest based upon objective probable cause has been upheld even when the arresting officers did not believe that such probable cause existed. *See Peters v. New York, decided with Sibron v. New York,* 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1904–05, 20 L.Ed.2d 917 (1968); *see also* 1 W. LaFave, *Search and Seizure* § 1.2, at 45–46 (Supp.1986).

Unlike the situations in the cases cited above where courts considered whether the officers' inadequate or improper motivations tainted an objectively reasonable search or seizure, in this case the officers justified the stop on pretextual grounds. Hawkins, citing *United States v. Sharpe,* 470 U.S. 675, 686–87, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605 (1985), argues that "[a] creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." He contends that in return for the latitude that *Terry* gives the the stopping officers to investigate based on suspicions developed in light of their senses, experience and training, *see* 392 U.S. at 27, 88 S.Ct. at 1883, "the police officers must tell the court the truth about what they were doing and why so that courts can pass on the reasonableness of

their actions." Appellant's brief at 18. We fail to see any basis for such a quid pro quo in the Fourth Amendment.

■ In effect, Hawkins is arguing that we should extend the exclusionary rule as a prophylactic measure to discourage false testimony by police officers. However, the Fourth Amendment is designed as a bulwark against incursions to an individual's personal liberty, protecting the individual from warrantless searches and seizures. If the seizure is based on a recognized exception from the warrant requirement, the concerns to which the Fourth Amendment is directed have been adequately met. The exclusionary rule was designed to deter unconstitutional conduct, not perjury. In the absence of a constitutional violation, there is no basis upon which to exclude relevant evidence. The laudible objective of discouraging police perjury does not warrant such a draconian sanction as exclusion.

The situation in this case, where there was a reasonable objective basis for the stop, is distinguishable from those cases where the police, having no valid basis for a stop or arrest, relied on a pretext to justify their actions. *See, e.g., United States v. Smith,* 799 F.2d 704 (11th Cir. 1986); *United States v. Cruz,* 581 F.2d 535, 541–42 (5th Cir.1978) (in banc). In those cases, it was not the pretext but the absence of a valid basis for the action that was determinative of the suppression motion. Even in *United States v. Smith,* on which Hawkins relies, the court emphasized that the appropriate focus should be "on objective reasonableness rather than on subjective intent or theoretical possibility." 799 F.2d at 710.

■ In short, despite the courts' general disapproval of police officers' resort to pretext, the outcome of suppression motions has generally depended on objective factors. *See, e.g., United States v. Lester,* 647 F.2d 869, 873 (8th Cir.1981) ("the validity of the arrest should be judged by whether the arresting officers actually had probable cause for the arrest, rather than by whether the officers gave the arrested person the right reason for the arrests"); *Klingler v. United States,* 409 F.2d 299, 305 (8th Cir.), *cert. denied,* 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969) ("Objectively, the facts known to [the officer] prior to the arrest and search met the standard of probable cause. Notwithstanding the officer's mistaken statement of grounds, the existence of probable cause for a robbery arrest prevents the robbery arrest from being considered pretextual"). We conclude that the fact that a pretext was given does not render invalid an otherwise constitutional search.[5] The district court did not err in holding, based on the objective reasonableness of the stop, that the evidence of the gun that Hawkins possessed should not have been suppressed.

### III.

#### *Legality of the Sentence*

##### A.

Hawkins had previously been convicted of two robberies and one burglary. Accordingly, following his conviction by the jury of violating 18 U.S.C. app. § 1202(a), he was sentenced to fifteen years imprisonment pursuant to the Armed Career Criminal amendment to 18 U.S.C. app. § 1202(a). That section provides:

> In the case of a person who receives, possesses, or transports in commerce or affecting commerce any firearm and who has *three previous convictions* by any court referred to in paragraph (1) of this subsection *for robbery or burglary, or*

---

**5.** The dissent suggests that while an objective standard may be appropriate for arrest cases, where the issue is probable cause, only a subjective standard is appropriate for investigatory stops, which are judged under a reasonable suspicion inquiry. We do not find this distinction persuasive. The probable cause and reasonable suspicion tests are similar in that they both look to the incriminating facts known to the seizing officer to determine the validity of a "seizure" under the Fourth Amendment. *See Terry,* 392 U.S. at 16–20, 88 S.Ct. at 1877–79. Thus, in *United States v. Hensley,* 469 U.S. at 230–33, 105 S.Ct. at 681–83, an investigatory stop case, the Supreme Court relied interchangeably on arrest and stop cases.

*both,* such person shall be fined not more than $25,000 and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under this subsection, and such person shall not be eligible for parole with respect to the sentence imposed under this subsection.

(emphasis added).

Hawkins argues that the Armed Career Criminal provision creates an unconstitutional classification of felons convicted of possession of a firearm. Unless a statute creates a suspect classification or impinges upon a fundamental interest, it will be upheld if the purpose of the classification bears some rational relationship to a legitimate state purpose. *See Benner v. Oswald,* 592 F.2d 174, 181 (3d Cir.), *cert. denied,* 444 U.S. 832, 100 S.Ct. 62, 62 L.Ed.2d 41 (1979). A statute will be held irrational under this test only if the classification it creates " 'rests on grounds wholly irrelevant to the achievement of the State's objective.' " *Id.* (quoting *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961)).

Hawkins admits that classifications based upon felony status are not suspect. Appellant's Brief at 31 n. 8. Nonetheless, he suggests that because the statute impinges on the liberty interest, we must subject the classification to a heightened level of scrutiny. *Id.* However, the Supreme Court has made clear that states are entitled to make their own classifications among crimes and criminals subject only to the strictures of the Eighth Amendment. *See Rummel v. Estelle,* 445 U.S. 263, 284, 100 S.Ct. 1133, 1144, 63 L.Ed.2d 382 (1980).[6] As the Court stated,

Like the line dividing felony theft from petty larceny, the point at which a recidivist will be deemed to have demonstrated the necessary propensities and the amount of time that the recidivist will be isolated from society are matters largely within the discretion of the punishing jurisdiction.

*Id.* at 285, 100 S.Ct. at 1145. *See also Jones v. Helms,* 452 U.S. 412, 423–26, 101 S.Ct. 2434, 2442–43, 69 L.Ed.2d 118 (1981). Congress is entitled to no lesser deference than state legislatures.

Hawkins argues that there is no rational basis for distinguishing between possession of a gun by a three-time robber/burglar and three-time other category felons, such as murderers, kidnappers, etc. We cannot agree that the special treatment of felons with three robbery or burglary convictions is not rationally related to a valid state purpose. Congress enacted the Armed Career Criminal provision for the purpose of incapacitating particular repeat offenders, who it found were responsible for a large proportion of crimes involving theft and violence. H.R.Rep. No. 1073, 98th Cong.2d Sess. 1–3, *reprinted in* 1984 U.S.Code, Cong. & Admin.News 3182, 3661, 3661–62.

Senator Arlen Specter, who introduced the enhanced penalty provision in the Senate, explained it as follows:

Robberies and burglaries are the most damaging crimes to society. Robberies and burglaries occur with far greater frequency than other violent felonies, affect many more people, and cause the greatest losses. A person is 40 times more likely to be a victim of robbery than of rape.

Robberies involve physical violence or the threat thereof, being deliberately directed against innocent individuals. Burglaries involve invasion of their homes or

---

6. Hawkins has not raised before us the question of the proportionality of the 15–year minimum sentence under the principle outlined in *Solem v. Helm,* 463 U.S. 277, 290–92, 103 S.Ct. 3001, 3009–10, 77 L.Ed.2d 637 (1983). Without deciding the issue, we note that in that case the Court stated that, " '[O]utside the context of capital punishment, *successful* challenges to the propor-

tionality of particular sentences [will be] exceedingly rare.' " *Id.* at 289–90, 103 S.Ct. at 3009 (quoting *Rummel v. Estelle,* 445 U.S. at 272, 100 S.Ct. at 1138), and that the Armed Career Criminal provision has been recently upheld in light of such a challenge in *United States v. Veloz,* No. 86CR323 (N.D.Ill. Sept. 16, 1986) [Available on WESTLAW, DCTU database].

workplaces, violation of their privacy, and loss of their most personal and valued possessions. Often—30 percent of robberies—these offenses result in physical injuries; usually—90 percent for robberies—they result in significant financial loss; always they inflict psychological injury. Such crimes force people to live not in freedom, but in fear.

Most robberies and burglaries are committed by career criminals. A high percentage of robberies and burglaries are committed by a limited number of repeat offenders. Many commit scores of offenses. Some studies estimated that the majority of these offenses are committed by career criminals. Career criminals often have no lawful employment; their full-time occupation is crime for profit and many commit crimes on a daily basis.

In New York City, for example, studies showed that only 1,100 recidivists were probably responsible for most of the 100,000 robberies each year. Another study showed that only 49 imprisoned robbers admitted committing 10,000 felonies over 20 years. A third study showed that only 6 percent of those born in 1945 who committed crimes were responsible for 80 percent of the offenses of their age group. Various studies also indicate that for every time a career criminal is arrested for robbery or burglary, he has probably committed 10 to 20 such crimes. Career criminals commit robberies and burglaries interchangeably.

H.R.Rep. No. 1073, 98th Cong.2d Sess. 3, *reprinted in* 1984 U.S. Code, Cong. & Admin. News at 3663 (quoting 129 Cong.Rec. S296 (daily ed. Jan. 26, 1983)).

■ Even assuming, as Hawkins suggests, that robbery and burglary are not the most violent offenses, nor the most prevalent, we are not willing to dispute Congress' findings that most robberies and burglaries are committed by a small number of career criminals, and that punishing firearm possession by repeat robbers and burglars is an effective means of furthering the congressional objectives. As we stated in *Government of the Virgin Is-*

*lands v. Harrigan,* 791 F.2d 34, 37 (3d Cir.1986), "It is a matter for the legislature and not for this court to determine ... which crimes warrant application of [habitual criminal statutes]." We therefore reject the contention that the statutory imposition of a mandatory fifteen year prison term on felons with three robbery/burglary convictions who possess a firearm violates equal protection.

### B.

■ Hawkins' remaining argument is based on the premise that the Armed Career Criminal Act added a new and separate firearm possession offense, this one punishable by fifteen years' imprisonment, in contrast to the lesser offense punishable by two years' imprisonment. Evidence was presented at trial that Hawkins had one prior burglary and two prior robbery convictions, but these prior convictions were not alleged in the indictment. Also, the district court instructed the jury that in order to convict under § 1202(a)(1), it was required only that they find beyond a reasonable doubt that Hawkins had been convicted of one felony. At sentencing, the district court found that Hawkins had the prior convictions alleged and on that basis sentenced Hawkins to 15 years' imprisonment and a $1 fine.

Hawkins argues that since he was neither indicted nor convicted by the jury of this separate enhanced offense, he can be sentenced to prison only for the maximum of two years applicable to the lesser offense. The government views the Armed Career Criminal provision as merely providing for enhancement of the otherwise applicable sentencing provisions under section 1202(a). The courts of appeals that have considered this precise issue have divided.

The Tenth Circuit viewed the provision as an "enhanced penalty ... designed to designate additional punishment for armed, repeating, criminals." *United States v. Gregg,* 803 F.2d 568, 570 (10th Cir.1986). The court continued: "This provision did not create any new federal crime—it only

increased the penalty for an already existing federal offense described in Sec. 1202—that crime being the possession of a firearm after being convicted of a felony." *Id.* Likewise, the Eighth Circuit in *United States v. Davis*, No. 86–1103 (8th Cir. Dec. 18, 1986) *, has held that the Armed Career Criminal Act is a sentence enhancement provision, and thus need not be charged to the jury. On the other hand, in *United States v. Davis*, 801 F.2d 754, 755 (5th Cir.1986), the Fifth Circuit held that the Armed Career Criminal provision of section 1202(a)(1) "is not merely a sentence-enhancement provision but creates a new offense." Therefore, it held that a defendant not indicted for that offense could not be convicted or sentenced thereunder. *Id.* at 756.

As is the case in all questions dealing with the scope and separate identities of criminal offenses, the answer hinges on the intent of Congress. *See Garrett v. United States*, 471 U.S. 773, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985); *Blockburger v. United States*, 284 U.S. 299, 303, 52 S.Ct. 180, 181, 76 L.Ed. 306 (1932); *Albrecht v. United States*, 273 U.S. 1, 11, 47 S.Ct. 250, 253, 71 L.Ed. 505 (1927).

In *Garrett v. United States, supra*, the Supreme Court recently analyzed an analogous issue, whether the statute making it a crime to engage in a continuing criminal enterprise in violation of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 848, created a distinct offense. In ascertaining the legislative intent, the Court looked to the language, structure, and legislative history of the statute. 105 S.Ct. at 2412. Using that case as a guide, we will examine each factor in turn.

The *Garrett* Court noted that the language of 21 U.S.C. § 848 "affirmatively states an offense for which punishment will be imposed", *id.* 105 S.Ct. at 2412–13 ("Any person who engages in a continuing criminal enterprise shall be sentenced to .. "), and makes no reference at the key point to any other statutory offenses. *Id.* at 2413. In contrast, the language of the second sentence of section 1202(a), which constitutes the whole of the Armed Career Criminal provision, is evidently a continuation of the preceding sentence, and refers thereto.

The first sentence of section 1202(a), which is set forth in full in the accompanying margin so that its language and structure can be examined,[7] lists the five classes of persons for whom it is a crime to receive, transport or possess firearms: (1) felons; (2) dishonorable dischargees; (3) mental incompetents; (4) renounced citizens; and (5) illegal aliens. The second sentence specifies one of the preceding classes of persons for different treatment. It does not stand on its own, but as an expansion of the preceding provision. Also, the inclusion of the Armed Career Criminal Act into the same paragraph as the previously enacted section 1202(a)(1), with no division into separate numbers or

---

**7.** This statute provides:

(a) Any person who—

(1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony, or

(2) has been discharged from the Armed Forces under dishonorable conditions, or

(3) has been adjudged by a court of the United States or of a State or any political subdivision thereof of being mentally incompetent, or

(4) having been a citizen of the United States has renounced his citizenship, or

(5) being an alien is illegally or unlawfully in the United States,

and who receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both. In the case of a person who receives, possesses, or transports in commerce or affecting commerce any firearm and who has three previous convictions by any court referred to in paragraph (1) of this subsection for robbery or burglary, or both, such person shall be fined not more than $25,000 and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under this subsection, and such person shall not be eligible for parole with respect to the sentence imposed under this subsection.

* Ed. note: See 816 F.2d 433.

letters, suggests treatment of the contents as a single offense.

The Fifth Circuit in *Davis* concluded that the provision established a separate offense because it failed to specifically predicate the enhanced punishment upon conviction under section 1202(a)(1), and failed to contain other indicia of sentence-enhancement provisions such as procedures for a sentencing hearing, a penalty derived as a multiplier of another offense, or a title indicating that it is a sentencing provision. 801 F.2d at 755–56. We find these relevant, but not conclusive. We believe an examination of all three factors, language, structure and legislative history, leads to an opposite conclusion.

Various parts of the legislative history of the Armed Career Criminal provision suggest that the provision does not create a separate offense, but rather imposes an enhanced penalty. In describing the decision to abandon the earlier language of the bill establishing a federal crime of armed robbery or burglary when committed by two-time robbers or burglars and to add to section 1202(a) instead, the House Report states:

> In "enhancing" this offense [§ 1202(a)] with H.R. 1627–type sanctions, if the defendant has been convicted three times of robbery or burglary, we are "enhancing" an existing Federal crime, which would alleviate many of the problems associated with H.R. 1627 such as the issue of a local D.A. veto or the difficulties encountered by Federal courts in applying State robbery and burglary laws in Federal prosecutions.

H.R.Rep. No. 1073, 98th Cong.2d Sess. 5, *reprinted in* 1984, U.S. Code Cong. & Admin. News at 3665.

The Fifth Circuit in *Davis* discounts this statement, suggesting that the term "enhancing" refers to the creation of a more severe offense. 801 F.2d at 756. *Davis* relies instead on language in the House Report stating that the Armed Career Criminal Act "amends 18 U.S.C. App.

§ 1202(a) by adding a *new offense....*" 801 F.2d at 756 (quoting, H.R.Rep. No. 1073, 98th Cong.2d Sess. 6, *reprinted in* 1984 U.S. Code Cong. & Admin. News at 3666). However, the Report clearly states that Congress was "enhancing" section 1202(a)(1) with "H.R. 1627–type *sanctions.*"[8]

Moreover, statements in floor debate by the principal sponsors of the bill make clear that the statement in the Report to the effect that the Armed Career Criminal provision created a new "offense" was a misstatement. Representative Hughes, principal sponsor of the amended Armed Career Criminal legislation in the House, stated:

> This bill would *enhance the sanctions* of 18 U.S.C. App. section 1202(a) with a 15–year minimum sentence if the defendant has been convicted three times of felonies for robbery or burglary.

130 Cong.Rec. H10550 (daily ed. Oct. 1, 1984) (emphasis added). Representative Sawyer, also speaking in support of the version of the provision finally enacted, stated:

> The proposal before us today is crafted to avoid Federal prosecution of State burglary or robbery charges. This proposal does not even expand Federal criminal law. H.R. 6248 takes an existing gun possession statute and *enhances the penalty* for any violation by a person having been previously convicted three times for armed burglary and robbery.

130 Cong.Rec. H10550–51 (daily ed. Oct. 1, 1984) (emphasis added). Senator Specter, the principal sponsor of Armed Career Criminal legislation in the Senate, likewise stated:

> *This bill would create no new Federal crime.* Under present section 1202(a), possession of a firearm by a convicted felon is already a Federal crime, with a maximum prison sentence of 2 years. This title would *simply provide for a stiffer sentence* for career criminals. It

---

**8.** The sanctions under proposed H.R. 1627 were a 15–year minimum sentence and a $10,000 maximum fine. H.R. 1627, 98th Cong., 1st Sess. § 2 (1983).

would not permit the Federal prosecution of any individual who could not be prosecuted under current Federal law, and would not trespass upon any State prosecutions or require Federal courts to apply State law.

130 Cong.Rec.S. 13080 (daily ed. Oct. 4, 1984) (emphasis added). There are numerous other statements to the same effect. *See, e.g.,* H.R.Conf.Rep.No. 1159, 98th Cong.2d Sess. 418, *reprinted in* 1984 U.S. Code Cong. & Admin. News 3710, 3714 (bill "establishes a mandatory 15–year sentence for a felon who, after having been convicted three times for robbery or burglary, violates *the* Federal law prohibiting [possession of a firearm] ...") (emphasis added); 130 Cong.Rec.H. 11982 (daily ed. Oct. 10, 1984) (statement of Rep. Smith) (bill "provides *enhanced penalties* for career criminals possessing a firearm").

We conclude that the members of Congress viewed the Armed Career Criminal Act as a statute providing for an enhanced penalty, and we construe it consistently with that legislative intent. It follows that Hawkins' prior convictions for burglary and robbery was not an element of the offense that needed to be charged or presented to the jury, but rather was a matter to be considered by the district court in sentencing.

Once the Armed Career Criminal provision is considered to be a sentencing provision, no due process issue is presented. In *McMillan v. Pennsylvania,* — U.S. —, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), the Court sustained against constitutional attack a state statute imposing a mandatory minimum five-year sentence upon the finding by the sentencing judge, by a preponderance of the evidence, that the defendant visibly possessed a firearm during commission of an enumerated offense. Similarly, we have upheld the statute authorizing the trial court to enhance a defendant's sentence upon the court's finding that a defendant is dangerous and a special offender. *See United States v. Davis,* 710 F.2d 104, 106–07 (3d Cir.), *cert. denied,* 464 U.S. 1001, 104 S.Ct. 505, 78 L.Ed.2d 695 (1983) (sustaining 18 U.S.C. § 3575(b) which au-

thorizes imposition of up to a twenty-five year special sentence on felons found by the trial court judge, by a preponderance of the evidence, to be dangerous special offenders). *See also McMillan,* 106 S.Ct. at 2420 (approvingly citing courts of appeals decisions treating the trial court's decision that defendant was both "dangerous" and a "special offender" as a valid sentencing consideration).

■ Finally, without deciding the extent, if any, to which notice of this type is constitutionally required, we note that there was adequate notice given by the government of its intention to seek enhanced penalties against Hawkins under the Armed Career Criminal provision. Such notice was filed two months before trial, stated the government's intention to request increased punishment under the provision, and listed in detail the prior convictions relied upon. *See Oyler v. Boles,* 368 U.S. 448, 452, 82 S.Ct. 501, 503, 7 L.Ed.2d 446 (1962) (defendant must be reasonably informed of the government's intention to seek an enhanced sentence); *United States ex rel. Swingle v. Rundle,* 318 F.2d 64 (3d Cir. 1963) (same). *Cf.* 18 U.S.C. § 3575(a); 21 U.S.C. § 849(a), § 851(a)(1) (procedures under statutory provisions imposing enhanced sentences upon dangerous special offenders).

Therefore, we reject Hawkins' challenges to the legality of the sentence.

### IV.

For the reasons set forth above, we will affirm the judgment of conviction.

ROSENN, Circuit Judge, concurring and dissenting.

I join in parts I and IIIA of the majority opinion.

I respectfully dissent from parts II and IIIB on two grounds. First, I cannot agree that evidence obtained by police officers under the guise of a pretextual stop is admissible because on hindsight a court can objectively find grounds for the police to

have had a reasonable suspicion. Second, I believe that the Armed Career Criminal Act (the ACCA or the Act) created a separate and independent offense for which the defendant was neither indicted nor convicted and, therefore, his sentence under the Act constituted a denial of due process.

## I.

In its original declaration of the exclusionary rule, in *Weeks v. United States*, 232 U.S. 383, 393, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914), the unanimous Supreme Court stated that if illegally obtained evidence could be used against a defendant the protection of the Fourth Amendment "might as well be stricken from the Constitution."

> The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land.

*Id.* The exclusionary rule exists not to keep unreliable evidence out of court, but to deter police from illegal intrusions into individuals' liberty and privacy.

The majority state correctly that "[t]he exclusionary rule was designed to deter unconstitutional conduct, not perjury." Maj. op. at 215. I do not, however, base my conclusion that the officers violated the fourth amendment upon their having testified falsely, reprehensible as that may be. The officers acted unconstitutionally in stopping Hawkins and his companions when they did not, as demonstrated by their own statements, have a reasonable suspicion of criminal activity other than the grounds dismissed by the district court as

pretextual.[1] Neither the detective's investigation report nor the officers' own incident report even mentioned the events allegedly observed on Washington Lane.

The existence of evidence that would have made a suspicion of criminal activity reasonable does not alter the fact that the officers admittedly were not acting under any such suspicion when they stopped the Hawkins car. The stop by police officers without even believing they had a valid suspicion of criminal activity is precisely the behavior prohibited by the fourth amendment. The advantage of hindsight distorts the reasonableness inquiry in fourth amendment cases. Once we know that a search did turn up evidence of crime, we are more likely to view as well-founded suspicions which at the time would have appeared groundless, and arbitrary action of police as intuitive and discerning. Improper searches of the innocent are not the subject of exclusionary rule debates and thus only very rarely are brought to courts' attention. The fourth amendment violation exists whether or not evidence is found; it occurs at the moment of the police intrusion. If the majority's reasoning is to be accepted, then, there is no longer any reason for the exclusionary rule. If that rule has any value and application, as I believe it does, it must exclude evidence produced by officers who asserted no credible suspicion of criminal activity.

The majority seem to believe, by analogizing to the standard in warrantless arrest cases, that even if police officers have no suspicion for an investigatory stop the evidence they obtain is admissible if, on hindsight, "there was a reasonable objective basis for the stop." Maj. op. at 215.[2] I believe that this is an unwarranted extension of the objective probable cause stan-

---

1. The Supreme Court has refused to allow pretextual arrests for minor offenses to support searches for greater offenses. *United States v. Lefkowitz*, 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932). *A fortiori,* where the "offense" supporting the search is not only minor, but wholly fabricated, the search is improper, and the evidence must be excluded. *United States v. Smith,* 799 F.2d 704 (11th Cir.1986).

2. The cases relied upon by the majority in support of an objective standard for the reasonable suspicion requirement, *United States v. Lester,* 647 F.2d 869 (8th Cir.1981), and *Klingler v. United States,* 409 F.2d 299 (8th Cir.), *cert. denied,* 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969), are each cases dealing with probable cause for arrest, not reasonable suspicion for a *Terry* stop.

dard for a full arrest to the reasonable suspicion requirement for an investigatory stop. Because an investigatory stop is less severe in its requirements than a warrantless arrest, the Supreme Court has required only a reasonable suspicion standard. By its very terms, however, a suspicion in essence is perception or belief and is, therefore, inherently subjective.

The stop in this case was a brief, investigatory stop of the type considered in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[3] The law is much more fully developed on the standards for a full arrest than for a *Terry* stop and the probable cause standard has been held to be objective.[4] Thus, it has further been held that the court may supply grounds not in fact relied upon to support probable cause for a full arrest.

The Supreme Court has declined to hold that the reasonable suspicion standard is similarly purely objective as to warrant a finding of such a "constructive suspicion." The majority suggest, maj. op. at 213, that in the cases following *Terry*, the Court used an *entirely* objective analysis for the reasonable suspicion standard. I cannot agree. The language of the very decisions cited by the majority setting forth and developing that standard, unlike that of those discussing the probable cause standard, suggests that the suspicion must be *both* objectively reasonable *and* subjectively actual.

The language of the *Terry* opinion indicates only that officers' subjective suspicions must be objectively reasonable, not that they may be supplied by the court. The later cases construing the *Terry* standard have consistently reiterated this analysis.

The Supreme Court specifically contrasted the probable cause and reasonable suspicion standards on this basis in *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), noting that

> "*probable cause*" *to believe* that the suspect is involved in criminal activity ... is required for a traditional arrest.... However, we have required the officers to *have* a reasonable suspicion, *based on* objective facts, that the individual is involved in criminal activity [to justify an investigatory stop].

*Id.* at 51 (emphasis added). Similarly, in *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 62 (1981), the Court stated that there are two elements of reasonable suspicion: (1) an assessment based on all the circumstances which (2) *must raise a suspicion* of wrongdoing. Finally, in *United States v. Brignoni-Ponce*, 422 U.S. 873, 882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607, the Court emphasized: "We are unwilling to let the [officers] dispense entirely with the requirement that *officers must have* a reasonable suspicion to justify" investigatory stops. (Emphasis added).

Accordingly, the court in *United States v. Thompson*, 712 F.2d 1356, 1359 (11th Cir.1983) stated:

> *Terry*-type investigative stops satisfy Fourth Amendment strictures if the officer *has* an objective, reasonable suspicion of unlawful activity ... *based on* articulate and specific facts known to him when the seizure occurred.

*Id.* at 1361 (emphasis added).

In short, the Supreme Court has time and again defined the reasonable suspicion standard in subjective terms, in contrast to the probable cause standard, which preced-

**3.** In *Terry*, the lower standard was justified to allow officers to search suspects upon apprehensions, not amounting to probable cause, because of danger from concealed weapons. A subjective standard is thus even more appropriate for a search incident to a *Terry* stop than to a full arrest: if the officer does *not* in fact have a suspicion that the danger may exist, there is no logical reason for the court to supply one.

**4.** Probable cause exists when, at the moment of arrest, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 80 (1964). *See also Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

ed the reasonable suspicion test and whose language could have been paralleled by the Court for the reasonable suspicion standard, had that been the Court's intention. The Court did not say these stops are justified if a police officer *has reasonable grounds to form a suspicion of criminal activity;* it required that the officer *does* so suspect, *and* that there exist facts within the officer's knowledge making that belief reasonable. When a court supplies the basis for what police in their own minds believe to be an impermissible stop, the rationale for the constitutionality of warrantless actions is undercut.

## II.

When it comes to sentencing enhancement, I have no differences with the majority over the constitutionality or the propriety of penalty enhancement statutes. They are intended to deter the illegal use of firearms and assure adequate punishment for those who commit crimes with guns. Such statutes serve a laudatory societal purpose and this court has upheld their constitutionality.[5] I believe, however, that the Armed Career Criminal Act does much more than enhance the sentence for an offense already punishable by statute, but creates an entirely new federal offense.

The typical sentence enhancement statute permits an increased sentence for the predicate or underlying offense. *See United States v. Schell,* 692 F.2d 672, 676 (10th Cir.), *rehearing denied,* (1982); *Government of the Virgin Islands v. Henry,* 533 F.2d 876, 878 n. 1 (3d Cir.1976). In the instant case, the Act, 18 U.S.C. App. § 1202(a)(1), provides that a felon convicted for possession of a firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both. On the other hand, a felon convicted of possessing a firearm who has three previous convictions for robbery, burglary, or both, shall be fined not more than $25,000 and imprisoned not less than fifteen years without suspension of sentence, grant of probation, or parole. Thus, the substantive offense for which Hawkins was tried and convicted

carried a maximum prior sentence of two years, but the prison sentence imposed by the court carried a minimum term of not less than fifteen years. This is a prime example of "a tail which wags the dog of the substantive offense," a concern expressed by the Supreme Court in its recent decision in *McMillan v. Pennsylvania,* —— U.S. ——, ——, 106 S.Ct. 2411, 2418, 91 L.Ed.2d 67 (1986). The ACCA requires imposition of a separate and severely enlarged sentence, at minimum not less than seven and one-half times more than the maximum for the predicate offense.

In this case, the grand jury indicted Hawkins only for the unlawful possession of a firearm, "hav[ing] been previously convicted of a felony under Pennsylvania laws." Hawkins' indictment did not charge three prior burglary and robbery convictions and, as the majority note, maj. op. at 217, the trial court instructed the jury that in order to convict, it was required only to find beyond a reasonable doubt that the defendant had been convicted of *one felony.* Thus, in imposing the magnified sentence, merely by attributing to the firearm conviction the three prior felonies, the court sentenced Hawkins for an entirely separate offense for which the defendant was neither indicted, tried, nor convicted, and without affording him the full panoply of the "relevant protections which due process guarantees in ... criminal proceedings." *United States ex rel. Gerchman v. Maroney,* 355 F.2d 302, 312 (3d Cir.1966).

I believe that the Act as applied in this case violates the due process clause of the Constitution. In *McMillan, supra,* the Supreme Court examined a state statute specifically to resolve whether that statute set forth a new crime or just a sentence enhancement. The Court set forth several criteria for this determination, under which the Act here clearly emerges as a separate crime. Unlike Pennsylvania's mandatory minimum sentencing act which the Supreme Court of the United States held constitutional in *McMillan,* § 1202(a)(1) does not merely provide for a mandatory minimum sentence which does not exceed the

5. *See, e.g., United States v. Davis,* 710 F.2d 104 (3d Cir.1983) (dangerous Special Offender Stat-

ute, 18 U.S.C. § 3575), *cert. denied,* 464 U.S. 1001, 104 S.Ct. 505, 78 L.Ed.2d 695 (1984).

maximum sentence provided for the enumerated felony charged in the indictment. By contrast, as mentioned above, the minimum sentence provided for in the ACCA multiplies many times the maximum sentence specified in § 1202(a)(1) for the indicted offense.

Again, unlike the Pennsylvania Mandatory Maximum Sentencing Act, the ACCA does not provide that the prior three felony convictions will be a sentencing factor that comes into play only after the defendant has been found guilty of the predicate offense. The contrast between the sentencing factor found acceptable in *McMillan* and the language of the Act as applied in this case is evident from Chief Justice Rehnquist's analysis in *McMillan:*

> Section 9712 [of the Pennsylvania Act] neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty; it operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it ... [and] "ups the ante" for the defendant only by raising to five years the minimum sentence which may be imposed within the statutory plan.

*Id.* —— U.S. at ——, 106 S.Ct. at 2417–18 (footnote omitted).

In emphasizing the significance of the Pennsylvania statute's not having raised the maximum penalty, the Supreme Court in *McMillan* contrasted that statute with the federal bank robbery statute, 18 U.S.C. § 2113(d),[6] which sets forth a separate and greater penalty for bank robbery involving the use of a dangerous weapon or device. —— U.S. at ——, 106 S.Ct. at 2417–19. This circuit, among others, has examined § 2113(d) and held that it creates a separate offense, not merely a sentencing factor. *United States v. Harvey*, 439 F.2d 142, 143 (3d Cir.), *cert. denied*, 403 U.S. 934, 91 S.Ct. 2264, 29 L.Ed.2d 713 (1971); *see also United States v. McKenzie*, 414 F.2d 808, 811 (3d Cir.1969).

The enhanced offense in § 1202(a) resembles § 2113(d) much more closely than the Pennsylvania statute construed in *McMillan* in that it raises dramatically the minimum penalty and lacks any explicit language denominating it a sentencing factor rather than an element of the offense. Indeed, the provision in § 1202(a) differs from the statute construed in *McMillan* even more than does § 2113(d), in that § 1202(a) imposes a mandatory sentence and denies suspension, probation, and parole. The Pennsylvania statute construed in *McMillan* provided only for an increased minimum sentence *not beyond the maximum.* No part of § 1202(a) is identified as a sentence enhancement provision and nowhere does it set out appropriate procedures for a sentencing hearing.

In recently analyzing the ACCA, Judge Ruben writing for the Fifth Circuit observed:

> The Act lacks other common indicia of sentence-enhancement provisions. It does not derive its penalty as a multiplier of § 1202(a)(1). Also, unlike typical sentence-enhancement statutes, 18 U.S.C. § 3575 (1982) and 21 U.S.C. § 849 (1982), for example, it is neither titled as a sentencing provision nor does it set out procedures for the sentencing hearing.

*United States v. Davis*, 801 F.2d 754, 756 (5th Cir.1986) (footnote omitted). Applying the reasoning used by the Court in *McMillan* and the rationale of *Davis*, the statute before us defines two separate offenses.

The majority conclude, relying largely on their interpretation of the legislative history, that the ACCA does not create a separate offense "but rather an enhanced penalty." Maj. op. at 219. The majority view as a misstatement the legislative history which speaks of the new amendment as *"adding a new offense."* H.R.Rep. No. 1073, 98th Cong.2d Sess. 4, *reprinted in* 1984 U.S. Code Cong. & Ad. News 3661,

---

**6.** Section 2113(d) provides:

> (d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any

person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both.

3666 (emphasis added). However, the legislative history is not as clear as the majority would have it.

In referring to the legislative history, the majority quote from the House Report, maj. op. at 219, as support for the view that the provision does not create a separate offense but only an enhanced penalty. Even that section of the House Report, however, does not state that Congress was enhancing the *penalty* for the indicted offense, but rather that "we are 'enhancing' an existing Federal *crime*" (emphasis added). This is what the Fifth Circuit in *United States v. Davis, supra,* found when, although it perceived no ambiguities in the Act, it nonetheless reviewed the legislation at the urging of the Government. Acknowledging that it found some indication consistent with an intent to provide merely for sentence enhancement, the court also found other legislative notes "even more suggestive of an intent to create a new offense." *Id.* at 756.

The majority cite to the opinion of a divided panel in *United States v. Davis,* No. 86–1103 (8th Cir. Dec. 18, 1986), and *United States v. Gregg,* 803 F.2d 568, 570 (10th Cir.1986), as supportive of its interpretation of the statute. The majority in *Davis,* however, merely stated a conclusion with little analysis of the legislative history of the Act. In *Gregg,* the court neither analyzed the ACCA nor reviewed its legislative history. Without any explanation, it too concluded that the provision did not create a new federal crime but only increased the penalty for an already existing federal offense. I find the careful and well-reasoned analysis of the Act by the Fifth Circuit to be the most persuasive.

### III.

In summary, I believe that if the exclusionary rule has any remaining vitality, it must operate here where the officers themselves did not have the required suspicion of criminal activity, and conducted a stop and search on a pretextual basis in what was at least an attempted violation of the fourth amendment. I would therefore reverse the conviction and sentence, and re-mand the case for a new trial at which the illegally obtained evidence will be excluded.

Likewise, because of the language and structure of the amendment to section 1202(a), its legislative history, and the enormous disparity between the penalty for the underlying offense for which Hawkins was indicted and the sentence imposed upon him, I believe that Congress created a separate offense for the possession of firearms by a felon with three prior felony convictions. Hawkins was neither indicted nor convicted for this offense. Therefore, if Hawkins's conviction is upheld, I would vacate the fifteen year sentence imposed upon him and remand for sentencing under the first sentence of section 1202(a)(1).