658 So.2d 112 (1995)
Phillip Thomas SAADI, Appellant,
v.
STATE of Florida, Appellee.
No. 94-00800.
District Court of Appeal of Florida, Second District.
May 19, 1995.
Rehearing Denied July 12, 1995.
Michael C. Cheek, Clearwater, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Tonja Vickers, Asst. Atty. Gen., Tampa, for appellee.
QUINCE, Judge.
Phillip Thomas Saadi seeks review of the trial court's order denying his motion to suppress evidence. We affirm because the officers had a well-founded suspicion of criminal activity which justified the stop of the vehicle in which appellant was riding.
On November 26, 1993, Officers James Griffis and Donald Herring were conducting surveillance of a house at 886 14th Avenue in Pinellas County, Florida. The house is in an area known for drug activity. This particular residence had been under surveillance by Officer Herring three times a week for a month. During this time vehicles would drive up to the residence, either along the street or in the driveway, black males would come out and approach the drivers or the drivers would get out of the vehicle, items would be handed back and forth, then the vehicle would leave. The officer testified three or four arrests were made after observing these activities, and the arrestees were found with cocaine on their persons.
Officer Herring indicated on the night in question at approximately 2:50 a.m. he was on foot directly across the street from the house when he observed a red Ford Escort pull into the driveway. He was 100 feet from the residence and used binoculars to aid his vision. Several black males came out of the house and approached the vehicle. Appellant got out of the front passenger side of the vehicle and walked toward the front of the Escort. Officer Herring radioed a description of appellant and the vehicle to Officer Atherton, who was in a cruiser a few blocks away. Appellant and one of the black males were engaged in conversation. The black male cupped his hand and held it out to appellant. Appellant looked down into the hand, then began reaching into his front right pocket. Both appellant and the other person walked further toward the house and behind another car parked in the driveway. After being behind the car for a few seconds, appellant turned around and quickly walked *113 back to the Escort. The car then backed out and drove away.
Officer Atherton testified he was in his marked cruiser when he was given information over the radio by Officer Herring concerning a red Escort and the appellant. He was told to stop the vehicle. After observing a cracked windshield, he got behind the vehicle and stopped it. On cross-examination Officer Atherton stated he stopped the vehicle based on the information given him by Officer Herring. Officer Herring was relaying the observations he made through the binoculars.
The only issue before this court is the legality of the stop.[1] Did the officers have a well-founded suspicion of criminal activity to justify a stop of the vehicle? We answer this question in the affirmative. A suspicion is founded when it has some factual foundation based on circumstances observed by the officer when those circumstances are interpreted in light of the officer's knowledge. Brown v. State, 636 So.2d 174 (Fla. 2d DCA 1994). The state must point to specific and articulable facts, together with rational inferences drawn from those facts, that reasonably suggest that criminal activity has occurred or is imminent. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Law enforcement officers are not required to look the other way and permit a crime to occur or a criminal to escape. Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). In the instant case, the facts and circumstances outlined above, including the surveillance of the house, observance of other drug activity, the actions of the appellant, as well as inferences drawn from those actions, combined to give the officer a well-founded suspicion that appellant had engaged in the criminal act of purchasing drugs.
The police, for reasons not disclosed in this record, had the residence under surveillance for a month. On other occasions the officer who was on surveillance duty on this night had observed what he believed to be drug transactions. These transactions occurred when a vehicle pulled in front of or into the driveway of the residence. Someone from inside would come to the vehicle or meet an occupant outside the vehicle. After a short exchange, the vehicle would leave the premises. On the night appellant was arrested, he was observed engaging in the same activities.
This case is similar to the situation addressed by the Third Circuit Court in United States v. Hawkins, 811 F.2d 210 (3d Cir.1987), where the court held the officer had a founded suspicion of criminal activity based on a police officer's surveillance of a house suspected of being a location for drug activities. During surveillance from 8:45 to 9:30 p.m. and 10:00 to 10:30 p.m. the officer observed people go to the front door or enter the house briefly and then leave. The officer did not actually see any drugs change hands, he observed "exchange of hand motion." At 11:30 p.m. on the same night, the officer saw a car containing two persons pull up to the residence. The passenger entered the house, returned to the car within five minutes and spoke to the driver for a minute, then returned to the house. A few minutes later the passenger returned to the car with two men who got into the rear seat of the car. The officer followed and stopped the car after observing the car pass a bus, cross a double yellow line and run a red light. The district court held there was no evidence justifying the stop based on a traffic violation; however, the events observed by the officer at the residence gave the officer a well-founded suspicion of criminal activity. On appeal the court affirmed finding the events observed justified a brief investigatory stop pursuant to Terry. Accord People v. Nelson, 443 Mich. 626, 505 N.W.2d 266 (1993) (stop upheld where defendants had been observed stopping for four minutes at a house that had been raided two weeks earlier for selling cocaine; house continued to operate as a source for drugs; and there had been a controlled buy at the house 30 minutes earlier); Pickersgill v. State, 516 So.2d 92 (Fla. 3d *114 DCA 1987) (founded suspicion justifying stops upheld where the police had information concerning bales of marijuana being offloaded from a truck into the garage of a drug house; a surveillance of the residence began and police observed activity consistent with the information given; they observed a truck exiting the garage and Pickersgill backing his car into the garage and closing the door; a second car came and backed up to the garage; both defendants were stopped when they left the residence).
While this case bears some similarities to Tinson v. State, 650 So.2d 189 (Fla. 2d DCA 1995), Powell v. State, 649 So.2d 888 (Fla. 2d DCA 1995), and Burnett v. State, 644 So.2d 152 (Fla. 2d DCA 1994), the instant case is factually distinguishable. In both Tinson and Powell the defendants entered the drug houses and left after a few minutes. The officers were unable to observe any activity inside the residences. There were no movements on the part of either defendant that would suggest illegal activity. The defendant in Burnett did not follow the pattern that had been established during the officer's surveillance. The police had seen persons make contact with someone at the house, go to the back of the house and leave. Burnett, however, parked in the front of the house, got out and talked with someone outside, walked out of view, then returned to his vehicle. These cases did not involve the police observing the defendant looking at something in the hand of another person or a gesture toward the front pocket, a gesture suggesting money being retrieved.
Based on the facts presented, the officers had a well-founded suspicion of criminal activity. The totality of the circumstances including the time of the day, the actions of the persons involved, and prior activity at this residence observed by the officers, when considered together justified an investigative stop of the vehicle in which appellant was a passenger.
We, therefore, affirm the judgment and sentence.
ALTENBERND, A.C.J., concurs.
BLUE, J., dissents with opinion.
BLUE, Judge, dissenting.
I respectfully dissent. The majority opinion attempts to distinguish this case from our recent opinion in Burnett v. State, 644 So.2d 152 (Fla. 2d DCA 1994), but I am unable to do so. Both this case and Burnett began with the surveillance of a "known crack house" in St. Petersburg. Both involved stops of vehicles leaving the premises based on the observations of the officers conducting the surveillance who would then notify other officers to make the stop. The houses in each case were within two blocks of each other.
Law enforcement allowed each of these drug sale operations to continue for a period of time, at least one month in this case and from January to August in Burnett, apparently finding that arresting drug purchasers was a more effective method of enforcing the drug laws than closing down the sales operations.
The facts as set forth in Burnett are:
Officer Adams testified that on the day of Burnett's arrest he saw Burnett's car park in front of this particular house. Burnett got out and spoke with a man outside of the house. Both men then walked out of Officer Adams' view for a few minutes. Shortly thereafter, Burnett returned to the car and appeared to be holding something in his hand which he did not appear to be holding when he arrived. Burnett then drove off. Officer Adams testified that he could not hear what Burnett said to the man at the house, saw nothing exchanged between the two men, saw no money, and did not see what was in Burnett's hand. Based on his observations, Officer Adams notified Officers Cooper and Trubilla to stop Burnett. Neither Officer Cooper nor Trubilla saw what Officer Adams had witnessed previously.
644 So.2d at 153.
In this case, Officer Herring provided the only testimony establishing the facts relied upon by the majority to find a founded suspicion. The officer's testimony at the suppression hearing was:

*115 DIRECT EXAMINATION
Q (BY MR. HOUNCHELL) [PROSECUTOR]: So back to this particular evening, can you describe to the court what you saw with regards to the defendant's arrest?
A [OFFICER HERRING]: I was out on foot, directly across the street of 14th Avenue, watching a house, when I saw a red Ford Escort pull into the driveway.
Q: How far would you approximate your distance from where you were standing to where this car was?
A: Probably about a distance of twice the length of this room from where I was at to where the house is at.
Q: Okay. A hundred feet, something like that?
A: Yeah. Approximately a hundred feet.
Q: Okay. This was 2:50, 3:00 in the morning. Did you have anything that would aid your vision?
A: I was using binoculars.
Q: How would you describe what you were seeing? How would you describe the binoculars?
A: They're very good binoculars. They're another officer's who works with me. Able to see very clearly.
Q: What did you see when this red Escort pulled up?
A: The Ford Escort pulls up, several black males come out of the house through their door on the northwest corner of the house, and they approached the vehicle.
At that time, they  the defendant, Saadi, later identified as Saadi, gets out of the passenger's side of the vehicle.
Q: Could you tell if he was in the front or back seat?
A: He was in the front passenger seat. He gets out of the vehicle and walks toward the front of the Escort, at which time, I give the basic description of what he's wearing, hair color and that to Officer Atherton, who's in an awaiting cruiser.
Q: And what did you see happen? Was the conversation observed? Did you see these people talking?
A: The black male was talking with Saadi. He eventually held  the black man eventually held out his hand and cupped it like that (indicating), at which time Saadi looked down at his hand. He went for what I could tell  reaching in his right front pocket, at which time, they walked back further towards the house and behind a car parked up in the driveway.
Q: And what's the next thing you saw?
A: At that point, they were back there about five seconds. Saadi turns back around, walks back quickly to the car, and then the car backed out and takes off.
Q: Okay. And at this time, you radioed the description of the car and the person  of the person who got out of the car, later identified as Saadi, over to Officer Atherton; correct?
A: Yes, I did.
* * * * * *
CROSS-EXAMINATION
Q [DEFENSE COUNSEL]: Okay. You saw a red Ford Escort pull into the area and you had not seen this Escort before, had you?
A: Not that I can recall.
Q: Did you recognize anyone in that vehicle as having  did you see anybody in that vehicle that evening that you had seen before?
A: No.
Q: At any time?
A: No.
Q: When the vehicle pulled into the parking lot, did the lights flash? Did the horn toot?
A: No.
Q: Did it appear as any kind of signal was made?
A: No.
Q: And you saw a black male talking with Mr. Saadi?
A: Yes, I did.
Q: Sir?
A: Yes, I did.
Q: Okay. He had his hand cupped?
A: Yes.

*116 Q: And Mr. Saadi was looking at his cupped hand?
A: Yes.
Q: And you cannot testify today whether or not Mr. Saadi reached into his pocket, can you?
A: No.
Q: You cannot testify today as to what was in that man's hand, can you?
A: No.
Q: You cannot testify today whether or not you even saw them exchanging whatever it was in the hand, can you?
A: No.
Q: But after they looked at whatever it was in this cupped hand, they turned and walked toward the door of that house that you're speaking of; is that correct, sir?
A: Yes.
Q: And you didn't see anything after that?
A: No. There was a car in the way.
Q: There was a car in the way. And then Mr. Saadi left, got back into the car, and the car left; is that correct?
A: That's correct.
Q: And you called Officer Atherton; is that correct?
A: Yes.
As Judge Parker stated in Burnett, "[o]bservations such as those of Officer Adams in this case, without his actually seeing a drug transaction or exchange of cash or packages consistent with drug transactions, are not sufficient to constitute a reasonable suspicion to support a stop." 644 So.2d at 153. If there is indeed a sufficient distinction between these two factual scenarios, to conclude that in one case there was no founded suspicion and in the other there existed a founded suspicion justifying a stop, that distinction is too subtle for me to discern. I would reverse the finding of founded suspicion in this case, based on this court's decision in Burnett, and therefore, I dissent.
NOTES
[1] Appellant does not contest the events which occurred after the stop of the vehicle, and the trial court did not rule on the issue of whether the stop, if based on a traffic infraction, was pretextual. The evidence does not support the state's argument that the stop was a valid one based on a broken window.