**UNITED STATES of America, Plaintiff,**

v.

**Jesus PADRON and Marcelino Rubio, Defendants.**

**Crim. A. No. 87–12 MMS.**

United States District Court,
D. Delaware.

March 20, 1987.

William C. Carpenter, Jr., U.S. Atty., Richard G. Andrews, Asst. U.S. Atty., Dept. of Justice, Wilmington, Del., for plaintiff.

David S. Lank, of Theisen, Lank, Mulford & Goldberg, P.A., Wilmington, Del., for defendant Rubio.

Josey W. Ingersoll and Bruce L. Silverstein, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendant Padron.

MURRAY M. SCHWARTZ, Chief Judge.

Defendants Jesus Padron ("Padron") and Marcelino Rubio ("Rubio") are charged with violating 21 U.S.C. § 841, possession of marijuana with intent to sell. Rubio is also charged with one count of possession of cocaine with intent to sell under 21 U.S.C. § 841. Defendants have filed motions to suppress the marijuana discovered in the search of the automobile, and Rubio moves to suppress his subsequent statements and the cocaine found in his car after the arrest as fruits of an illegal search. The Court held an evidentiary hearing on March 6. The Court will deny defendants' motions for the reasons discussed below.

## FACTS

On January 14, 1987, defendants were travelling north on Interstate 95 ("I–95") from Miami, Florida, with an ostensible destination of Boston, Massachusetts, in Rubio's car. Padron was driving throughout this episode, with Rubio in the passenger seat. After defendants left the toll booth on I–95 just inside the Delaware border, Corporal Michael Wilbur ("Cpl. Wilbur") of the Delaware State Police began to follow. The officer stated his suspicions were aroused by defendants' car, but he gave no specific reason for tracking it.[1] Cpl. Wilbur drove an unmarked car, but was in uniform, and defendants testified they noticed him following almost immediately. The officer stated that defendants were driving below the speed limit, an unusual occurrence on I–95, and he tailed them for approximately 11 miles. He also noted the car had a Florida license plate, but he did not run a check on the number.

Defendants exited I–95 on to Route 13, a four lane highway, and proceeded south for eight miles, still followed by Cpl. Wilbur. The officer stated the defendants' car continued under the speed limit, causing traffic to back up on the two southbound lanes, and cars were forced to pass the defendants. Padron testified that he drove between 50 and 55 miles per hour, and kept up with traffic at all times. While travelling down Route 13, Cpl. Wilbur radioed Trooper Albert Homiak to request assistance. Trooper Homiak proceeded south on Route 13 and approached defendants' vehicle from the rear, where he followed them for approximately two miles; Cpl. Wilbur was directly in front of the defendants at this point. Upon travelling eight miles south on Route 13, both officers testified that defendants' car began weaving within its lane, and then while negotiating a curve moved three feet into the left lane, nearly striking a passing truck. Padron testified that he maintained a steady course throughout and never left his lane. Trooper Homiak turned on his emergency lights and the three automobiles pulled over to the right shoulder.

After stopping, Rubio exited the passenger side and approached Trooper Homiak, who was behind defendants' car. They met between the vehicles, where Rubio gave Trooper Homiak the car registration and they had a brief conversation. Rubio stated that he was looking for Route 301, which he believed was a shortcut, and that his destination was Boston. The two men then went to sit in Trooper Homiak's car as it was exceptionally cold. Trooper Homiak then asked Rubio the name of the driver, who Rubio could only identify initially as "Jesus," and then he remembered the last name. Trooper Homiak testified that he looked at the registration and knew Rubio owned the vehicle.

During this exchange, Cpl. Wilbur approached the driver's side and spoke with Padron through a partially open window. Padron handed over his driver's license and stated he did not have the registration. Cpl. Wilbur then asked Padron to come to his vehicle. When Padron opened the door, Cpl. Wilbur testified he smelled a "very moderately strong" odor emanating from the car that he immediately identified as raw marijuana. Tr. at 10. He stated that from the strength of the odor he believed there was "a considerable amount" in the car. Padron and Rubio testified they smoke cigarettes and cigars, respectively, and that the car had a strong tobacco odor from the smoke and ashtrays.

---

1. A. There have been vehicles that I have followed for a number of miles until they come to a stop, gotten to their residence or whatever. I just felt I wanted to stop and I followed them until they have committed a violation.
Q. You were aware of the fact it had a Florida license plate the entire time you were following the car?
A. I knew it had a Florida plate.
Q. Did you know what the license was at the time you were following the car?
A. Did I know exactly what it was?
Q. Yes.
A. No. I just knew it was a Florida license plate.
Q. Was that why you were following the car for 19 miles?
A. I felt there was something suspicious about the vehicle.
Transcript of March 6, 1987 Suppression Hearing at 50–51 ("Tr.")

Once inside his car, Cpl. Wilbur questioned Padron about his destination and the name of the passenger, who Padron could only identify as "Ivan," which is Rubio's common name. Cpl. Wilbur testified that upon asking if he could search the car, Padron "told me it was not his vehicle, and I explained to him that he is the operator of the vehicle and in charge of that vehicle." Tr. at 11. Padron testified that he also told Cpl. Wilbur that "the other man" owned the automobile. Padron then agreed to the search, at which point Cpl. Wilbur filled out a standard Delaware State Police consent form in Spanish, which Padron reviewed cursorily before signing.[2]

Cpl. Wilbur then met briefly with Trooper Homiak next to defendants' car to compare their stories. Cpl. Wilbur stated that Padron had signed a consent form, at which point Trooper Homiak secured his car by removing the keys and storing his weapons. He then informed Rubio that the car would be searched, and Rubio did not respond. Trooper Homiak did not, however, inform Cpl. Wilbur that Rubio owned the vehicle. The defendants' car, a 1982 Mustang, was a hatchback without a separate trunk area. While Trooper Homiak was at his car, Cpl. Wilbur opened the driver's door and opened a leather bag in the back seat. He immediately discovered a ziplock bag containing marijuana. The officers then placed the defendants under arrest and resumed the search. Trooper Homiak opened the hatchback door and searched the other leather bags, finding additional caches of marijuana. He then radioed for a tow truck to remove the vehicle, and the officers transported the defendants separately to Troop 6. Prior to departing the scene, Trooper Homiak testified that Rubio made two unsolicited statements: 1) "Nice job." 2) "There is forty-one pounds in there," while gesturing toward the car. While driving to Troop 6, Rubio stated, "I guess I'll get about ten years for this." Trooper Homiak testified

that these statements were wholly unsolicited, and he neither initiated the conversation nor questioned defendant. Both officers testified that the defendants were never apprised of their *Miranda* rights, before or after the arrest.[3] Upon his return to Troop 6, Trooper Homiak continued the search, discovering additional marijuana and one kilo of cocaine hidden behind a speaker.

## ANALYSIS

The government argues that Padron, as only a passenger in Rubio's car, does not have standing to challenge the validity of the search. Defendants make three arguments: 1) the stop was pretextual as the officers had no objective basis for finding a traffic violation; 2) Padron's consent was invalid because he was not the owner of the vehicle and he did not act voluntarily; 3) there was no factual basis for Cpl. Wilbur smelling raw marijuana to provide probable cause to search the vehicle. The Court will consider these arguments seriatim.

### I. Standing

The Supreme Court established the parameters for determining whether a defendant can challenge a search or seizure under the Fourth Amendment in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The fundamental inquiry is "whether the disputed search or seizure has infringed an interest of the defendant" that is constitutionally protected. *Id.* at 140, 99 S.Ct. at 429. The court must ascertain whether the defendant has a "legitimate expectation of privacy in the invaded place." *Id.* at 143, 99 S.Ct. at 430 (citing *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967)). A search outside defendant's zone of privacy cannot be challenged because "Fourth Amendment rights are personal rights, which, like some other constitution-

---

2. The entire conversation between Padron and Cpl. Wilbur was in English. Padron, a Cuban, has resided in this country since 1980 and testified he comprehended fully the interrogation.

3. Rubio does not argue that his statements should be suppressed based on the officer's failure to give *Miranda*. His only argument is the statements are the tainted product of an illegal search and seizure.

al rights, may not be vicariously asserted." *Rakas*, 439 U.S. at 133–34, 99 S.Ct. at 425. Defendant bears the burden of proving he had a legitimate expectation of privacy in the area searched by Cpl. Wilbur and Trooper Homiak. *Id.* at 130 n. 1, 99 S.Ct. at 424 n. 1. The Court must look at the totality of the circumstances to determine whether Padron had a privacy interest in Rubio's automobile, and the scope of that interest.

■ Padron's lack of an ownership interest in the car does not necessarily prevent him from having standing. A number of courts have held that where a defendant can prove the owner granted permission to occupy and operate the vehicle, that is sufficient to create a legitimate expectation of privacy. *United States v. Rose*, 731 F.2d 1337, 1343 (8th Cir.), *cert. denied*, 469 U.S. 931, 105 S.Ct. 326, 83 L.Ed.2d 263 (1984); *United States v. Williams*, 714 F.2d 777, 779 n. 1 (8th Cir.1983); *United States v. Portillo*, 633 F.2d 1313, 1317 (9th Cir.1980), *cert. denied*, 450 U.S. 1043, 101 S.Ct. 1764, 68 L.Ed.2d 241 (1981); *United States v. Ochs*, 595 F.2d 1247, 1253 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979). Rubio testified he invited Padron to accompany him on the trip and, as is apparent from Rubio's presence, expressly authorized Padron to operate the car. There are clear indicia that Padron had a reasonable expectation of privacy in the vehicle, in that from their departure from Miami the previous day until the stop the defendants spent virtually all of their time in the car, including eating and sleeping there.

The more troublesome issue is the scope of Padron's expectation of privacy. The officers discovered the incriminating evidence in four pieces of luggage stored in the rear area of the car. Padron testified that the only items he brought were a backpack and jacket, which were not among the items searched or seized. Further, in response to the counsel's question, "Were you aware that there was anything in the car?" he said "No." Tr. at 101–102. Padron has denied having any proprietary interest in the luggage or knowledge of the contraband's presence.

■ The Supreme Court has held that an ownership interest in the object of the search is one factor in determining whether an expectation of privacy exists. *Rawlings v. Kentucky*, 448 U.S. 98, 105–106, 100 S.Ct. 2556, 2561–2562, 65 L.Ed.2d 633 (1980). Padron does not assert ownership of Rubio's luggage, and has not introduced evidence to show he had any other possessory interest strong enough to generate a personal expectation of privacy in the bags. *See Government of Virgin Islands v. Williams*, 739 F.2d 936, 939 (3d Cir.1984). Padron's sole interest is that Rubio's luggage was in an area in which he had a legitimate expectation of privacy. That alone is insufficient to permit him to challenge the search. *United States v. McGrath*, 613 F.2d 361, 365 (2d Cir.1979), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2946, 64 L.Ed.2d 827 (1980). Padron cannot, therefore, vicariously assert Rubio's Fourth Amendment right to challenge the search of the luggage.

## II. The Stop

Defendants argue Cpl. Wilbur and Trooper Homiak pulled them over as a pretext to permit a search of the car, and that there was no objective basis on which to effect a traffic stop. The Supreme court has held that traffic stops are "more analogous to a so-called '*Terry* stop' than to a formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). The stop must be based on a reasonable suspicion, *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975), and the court makes an objective assessment of the officer's action. *Maryland v. Macon*, 472 U.S. 463, 470, 105 S.Ct. 2778, 2782, 86 L.Ed.2d 370 (1985). Two recent Circuit Court cases, *United States v. Hawkins*, 811 F.2d 210 (3d Cir.1987) ("*Hawkins*"), and *United States v. Smith*, 799 F.2d 704 (11th Cir.1986) ("*Smith*"), have extensively analyzed the question of pretextual stops in relation to alleged Fourth Amendment illegal searches. The Court will review

those cases to ascertain the governing principles.

In *Hawkins*, two officers followed the defendant from a suspected drug location where they had observed several persons entering a house and conducting brief transactions. At 212. The officers tailed the vehicle for several miles, observing it commit a number of traffic violations. *Id.* Once the defendant stopped, the officers approached and observed him drop a gun on the seat and cover it. *Id.* At the suppression hearing, the officers testified they detained the suspects "in order to conduct an investigation of the alleged traffic violations." *Id.* The District Court rejected that basis for the stop, but found the officers had a reasonable suspicion that a narcotics violation had occurred. *Id.* at 212–13.

The Third Circuit Court of Appeals affirmed, stating that "the legality of a stop must be judged by the *objective factors* known to the seizing officer rather than by the justifications articulated by them." *Id.* at 213 (Emphasis added). It noted that an officer's subjective motivations do not otherwise affect the analysis of whether a valid basis existed for a seizure. The objective facts in *Hawkins* were the reputation of the drug location, the officers' observations of transactions, and the actions of the occupants of the car. The Court of Appeals held, "[D]espite the courts' general disapproval of police officers' resort to pretext, the outcome of suppression motions has generally depended on objective factors.... We conclude that the fact that a pretext was given does not render invalid an otherwise constitutional search." *Id.* at 215.[4]

In *Smith*, an officer saw two defendants drive past who matched the DEA drug courier profile. 799 F.2d at 706. The officer followed them for a mile and a half, observing it weave within its lane. At the suppression hearing, he testified he intended to make an investigatory stop on the basis of the courier profile, not because the car had weaved. *Id.* After the stop, the officer summoned a "drug dog" that indicated the presence of contraband. The vehicle was then searched and drugs discovered. *Id.* The District Court found that any alleged traffic violation was only a pretext for the stop, and the Eleventh Circuit Court of Appeals affirmed that holding.[5] The Court of Appeals stated the proper test for reviewing the officer's action is "whether a reasonable officer *would* have made the seizure in the absence of illegitimate motivation." *Id.* at 708 (Emphasis in original). The question, therefore, is whether the stop was "objectively reasonable." *Id.* at 709. The Court of Appeals found the traffic stop for weaving a pretext, and because no other reasonable basis for the seizure existed, held the search unconstitutional. *Id.* at 711–12.[6]

Both *Hawkins* and *Smith* find the governing principle to be the presence of objective factors that create a reasonable suspicion to stop the defendant considered apart from a particular officer's statement of the basis for the seizure. The results in the two decisions can be reconciled by considering how the Courts of Appeals analyzed those objective factors in the context of a particular stop. In *Smith*, the Court rejected the drug courier profile and found the traffic stop as unsupported by objective facts, while *Hawkins* found a sufficient

---

4. The Court of Appeals' rationale focused on the policies underlying the exclusionary rule. The fact an officer's testimony exhibits a pretextual basis for a stop when an independent, constitutional ground existed that the officer could successfully have testified on should not result in suppressing evidence. "The exclusionary rule was designed to deter unconstitutional conduct, not perjury." At 215.

5. The Court of Appeals found the drug carrier profile, standing alone, insufficient to furnish reasonable suspicion for a stop. 799 F.2d at 707

n. 3. The Court vacated and remanded the lower court's denial of the motion to suppress.

6. The Court of Appeals noted that "[w]e need not now decide when, if ever, a stop for probable cause resulting from an observed traffic violation might be invalid as pretextual...." 799 F.2d at 709, 710 n. 9. It is not clear how a stop based on probable cause could at the same time be pretextual, in that a pretext means there was no probable cause based on objective factors. The terms are mutually exclusive for purposes of determining the validity of a stop.

objective basis in the officers' observations and knowledge prior to the traffic violations to permit a stop. In considering *Smith,* the *Hawkins* Court stated, "The situation in this case, where there was a reasonable objective basis for the stop, is distinguishable from those cases where the police, having no valid basis for a stop or arrest, relied on a pretext to justify their actions. *See, e.g., United States v. Smith,* 799 F.2d 704 (11th Cir.1986)...." At 215. The Third Circuit Court of Appeals found that "it is unnecessary for us to consider whether the officers' observations of a traffic violation would alone have justified the stop," *id.* at 213, n. 4, the very circumstance presented in *Smith* and this case.

■ This Court must make the initial determination of whether an objective basis existed for Cpl. Wilbur and Trooper Homiak to stop the defendants. If unsupported by objective facts, the stop was illegal as a pretext. The government presents no evidence beyond the alleged traffic violation for the stop, and Cpl. Wilbur's testimony indicates he followed the car for 19 miles on an unspecified "hunch," which cannot without more provide a reasonable suspicion to stop the defendants. A necessary aspect of this analysis will be weighing the credibility of the witnesses, as the two sides disagree on whether a traffic violation occurred.

■ The defendants were cited under 21 *Del.C.* § 4176 for operating the "vehicle in a careless or imprudent manner, or without regard for road, weather and traffic conditions then existing." The primary basis for stopping the car was the weaving in its lane and crossing over into the next lane, nearly striking another vehicle. The Court credits the testimony of Cpl. Wilbur and Trooper Homiak that they observed the violation, and both were close enough to have seen it in sufficient detail to find a violation. The Court also credits Cpl. Wilbur's testimony that the vehicle's slow pace caused traffic to become congested on Route 13, a four lane road (two lanes in each direction) especially susceptible to traffic blockages that pose a danger to motorists. Cpl. Wilbur's testimony regard-

ing defendants' speed on I–95 is discounted, however, and the Court has not considered it in determining whether there were objective factors supporting the stop. The careless driving provision is broad, and given the defendants' acts, there was a sufficient basis to warrant effecting a traffic stop. *See Delaware v. Prouse,* 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979) (probable cause arising from violation necessary to stop car).

■ Defendants argue strenuously that Padron had driven nearly 19 miles without a traffic violation, and the extreme distance over which Cpl. Wilbur followed the defendants demonstrates the stop was a pretext to permit a search. There are two flaws in defendants' argument. First, the duration of the tail is immaterial on whether, at the moment of the stop, objective facts existed that created a reasonable suspicion of a traffic violation. Police are permitted, even encouraged to act on their suspicions so long as they do not violate a person's rights. *See, e.g., United States v. Sharpe,* 470 U.S. 675, 677, 105 S.Ct. 1568, 1570–1571, 84 L.Ed.2d 605 (officer followed defendants for 20 miles based on suspicious act). Second, Cpl. Wilbur's subjective intent is not directly relevant to the existence of an objective basis for the stop. *Hawkins,* at 213–14; *Smith,* 799 F.2d at 708–09.

The Court finds the officers' testimony credible, and rejects the defendants' testimony concerning the acts leading to the stop. Therefore, an objective basis existed that a traffic violation occurred, and the officers had probable cause to effect a traffic stop.

### III. Consent

The Supreme Court recognizes that a person can consent to a warrantless search. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). The burden of proof, by a preponderance of the evidence, rests with the government to demonstrate consent was given freely and voluntarily. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972); *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct.

1788, 1791, 20 L.Ed.2d 797 (1968). The power to consent is not limited to the defendant, but may be given by "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). In *Matlock*, the court delineated the meaning of "common authority" as "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 171 n. 7, 94 S.Ct. at 993 n. 7.

 The government makes the anomalous argument that Padron had the authority, as the operator of the car, to consent to the search but, because he does not own the car, he has no standing to challenge the search. The issue of authority to consent is related to a defendant's sharing access or control of the searched area, i.e., the scope of his reasonable expectation of privacy. On the facts of this case, Padron's privacy interest would be coterminus with his authority to consent because both interests are derived from Rubio's having granted him a possessory right in the car.

The Court has held Padron's legitimate expectation of privacy did not extend to Rubio's luggage. There is no evidence that Padron had access to or control over the containers searched or that Rubio assumed the risk of an inspection by placing the bags in close proximity to Padron. Moreover, prior decisions recognize that third-party consent may not cover every possible object or enclosed area. *See United States v. Block*, 590 F.2d 535, 541 (4th Cir.1978) ("authority to consent to search of a general area ... cannot be thought automatically to extend to the interiors of every enclosed space capable of search within the car."); *United States v. Gilley*, 608 F.Supp. 1065, 1068 (S.D.Ga.1985) (guests in house "may have privacy interests in specific property which cannot be waived by a third party's consent to a search of the general premises."). The government has failed to introduce evidence to demonstrate that Padron possessed sufficient authority, aside from driving the vehicle, to validly consent to a search of Rubio's luggage.

The government may seek to rely on Padron's apparent authority to consent to a search of all items in the car, and Cpl. Wilbur's good faith belief that as the driver Padron possessed the necessary authority. Courts recognize that an officer's reasonable, albeit mistaken belief in a third party's power to consent should not require suppression because the deterrent rationale of the exclusionary rule is not advanced by excluding otherwise probative evidence seized in good faith. *See Riley v. Gray*, 674 F.2d 522, 528 (6th Cir.), *cert. denied*, 459 U.S. 948, 103 S.Ct. 266, 74 L.Ed.2d 207 (1982); *United States v. Sledge*, 650 F.2d 1075, 1080–81 (9th Cir.1981). As the Sixth Circuit Court of Appeals noted in *Riley v. Gray*, however, that belief must be reasonable under the circumstances. 674 F.2d at 529.

 The facts demonstrate there was no reasonable basis to believe Padron could authorize a search. Cpl. Wilbur testified that Padron specifically stated he was not the owner of the vehicle, a fact the officer rather blithely ignored. Cpl. Wilbur knew or should have known then that Padron's authority to consent was at least questionable. At the same time, and only a few feet away, Trooper Homiak knew Rubio was the car's owner. The officers met briefly before beginning the search, at which point Cpl. Wilbur stated Padron had consented. Each officer had independent, reasonable bases to doubt the efficacy of Padron's consent, yet neither pursued the matter.

In considering instances where a person waives a constitutional right, and especially where the waiver is effected by a third party, the Court must scrutinize the government's actions closely. In this case, the officers had ample opportunity to engage in further questioning without endangering themselves or their investigation. Moreover, at least one officer knew a sus-

pect with a superior privacy interest was present, which makes the validity of the consent even less certain. *See United States v. Impink,* 728 F.2d 1228, 1234 (9th Cir.1984). The officers' failure to inquire into Padron's authority or seek Rubio's consent was unreasonable. To hold otherwise would condone, even encourage the police to avoid inquiries into factual circumstances in order to ensure "good faith." *Riley v. Gray,* 674 F.2d at 529.

The Court finds that, under the standards for third-party consent enunciated in *Matlock,* the government cannot rely on Padron's authority, actual or apparent, to consent to the search of Rubio's luggage.[7]

## IV. Probable Cause to Search

Courts have long recognized an automobile exception to the warrant requirement, permitting a search where the officer has probable cause. *See Chambers v. Maroney,* 399 U.S. 42, 49–51, 90 S.Ct. 1975, 1980–1981, 26 L.Ed.2d 419 (1970) (discussing history of automobile exception). One basis for probable cause is an officer's first-hand sense impressions. In *Johnson v. United States,* the Supreme Court stated, "If the presence of odors is testified to before a magistrate and ... it is one sufficiently distinctive to identify a forbidden substance, this Court has never held such a basis insufficient to justify issuance of a search warrant. Indeed it might very well be found to be evidence of most persuasive character." 333 U.S. 10, 13, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). A number of courts have held that the smelling of marijuana by an experienced observer provides probable cause to engage in a warrantless search of an automobile. *See United States v. Lopez,* 777 F.2d 543 (10th Cir. 1985); *United States v. Haley,* 669 F.2d 201 (4th Cir.), *cert. denied,* 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982); *United States v. Rivera,* 595 F.2d 1095 (5th Cir.1979); *United States v. Garcia-Rodriguez,* 558 F.2d 956 (9th Cir.1977), *cert. de-*

*nied,* 434 U.S. 1050, 98 S.Ct. 900, 54 L.Ed.2d 802 (1978). Although the Third Circuit Court of Appeals has not considered this issue, the Court believes precedent overwhelmingly favors the position that marijuana odor can provide probable cause to search. *Cf. Government of Virgin Islands v. Williams,* 739 F.2d 936, 939 (3d Cir.1984) (existence of probable cause justifies warrantless car search).

Cpl. Wilbur testified that when Padron opened the driver's door he smelled a "very moderately strong" odor of raw marijuana. Padron testified the windows were closed during the trip because of the cold, which would permit the marijuana odor to build up prior to the stop. Tr. at 122–23. Cpl. Wilbur also testified he had received training in identifying the smells of controlled substances, including marijuana. *Id.* at 18–19. He stated that he can distinguish the odor of marijuana from tobacco, if a sufficient quantity of the contraband is present. The officer's experience and expertise is one part of the analysis to determine whether sufficient objective facts exist to provide probable cause. *United States v. Sweeney,* 688 F.2d 1131 (7th Cir. 1982).

In *Illinois v. Gates,* the Supreme Court counselled that the totality of the circumstances must be reviewed to determine whether probable cause exists. 462 U.S. 213, 230–31, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983). The Court credits Cpl. Wilbur's testimony that he smelled raw marijuana, and the strength of the odor connoted a substantial amount in the automobile. In addition, the Court finds that the officer had the necessary training and expertise to fairly identify the smell and distinguish the peculiar marijuana odor from any tobacco residue. Defendants argue that it was objectively impossible to smell the raw marijuana because it was enclosed in plastic ziplocked bags, surrounded by coffee grounds, and packed in

---

7. Defendants also argue that Padron's consent was not voluntary under the totality of the circumstances. They assert that, once Cpl. Wilbur smelled the marijuana in the car, he had probable cause to arrest and should have advised defendant of his *Miranda* rights prior to seeking the consent to search. In light of the Court's disposition of this issue favorably to the defendants, it is unnecessary to consider the voluntariness question.

leather luggage. There is no evidence in the record that the marijuana was concealed in coffee, and the inference that a person could not smell raw marijuana in plastic bags has not been proven beyond defendants' bald assertion.

Upon reviewing the totality of the circumstances, the Court finds that Cpl. Wilbur had probable cause to search the vehicle, including the luggage in the rear area.

## CONCLUSION

In light of the foregoing analysis, the Court will deny defendants' motions to suppress.